THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DORLEENA KOLAKOWSKI, Defendant-Appellant.

First District (2nd Division)   No. 1—97—4293

Opinion filed January 30, 2001.—Rehearing denied March 5, 2001.

Rita A. Fry, Public Defender, of Chicago (Pamela Pfrang, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth

T. McCurry, and Janet Powers Doyle, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

On August 20, 1994, 89-year-old Leo Radzikinas was murdered in his home. Within three days of the crime, defendant Dorleena Kolakowski and her boyfriend, Corey West, were arrested for his murder. Defendant, who was 13 years old at the time of the offense, was indicted for first degree murder, armed robbery, home invasion and residential burglary. The juvenile court granted the State's motion to transfer the case to criminal court. The trial court denied defendant's motions to quash her arrest and suppress her statements.

Following a bench trial, defendant was convicted of first degree murder and sentenced to 40 years in the Department of Corrections. On appeal, defendant argues that: (1) the juvenile court abused its discretion by transferring her case to criminal court; (2) the trial court erred by denying defendant's motion to quash arrest; (3) the trial court erred by denying defendant's motion to suppress an involuntary statement; and (4) the trial court erred by imposing a 40-year sentence.

## BACKGROUND

### TRANSFER HEARING

Following defendant's arrest, a transfer hearing was held to determine whether she should be prosecuted as an adult. At the transfer hearing, several witnesses were called, including: Dr. Peter Fink, a psychiatrist; and two probation officers, Janet Ederle and Carol Zientek.

Dr. Fink diagnosed defendant with depressive disorder (not otherwise specified), dysthymic disorder and posttraumatic stress disorder acute. Depressive disorder, not otherwise specified, means periods of feeling sad, hopeless, and helplessly overwhelmed, but not in a consistent or persistent manner. Dr. Fink indicated that defendant had no history of being violent toward others and knew right from wrong. He found her to have slightly above average intellectual potential. He thought defendant's case was treatable and recommended a residential treatment facility, which was only available through the juvenile system. To be successful, the treatment required an opportunity for defendant to develop attachments to peers and adults that were consistent and sustained and an opportunity for teaching and reinforcing that she is valued and competent in what she masters. In Dr. Fink's opinion, if defendant received two to four years of residential treatment, she could potentially be rehabilitated.

Probation officer Janet Ederle had been familiar with defendant's

family for four years. She previously served as probation officer for two of defendant's older siblings. Defendant's parents had contacted Ederle several weeks before the crime to discuss defendant's truancy and frequent habit of running away from home. After the crime, Ederle was assigned as defendant's probation officer and conducted a social investigation of her. Ederle believed that defendant should be transferred to the adult system due to the nature of the offense, defendant's history within her family and community, and the fact that there were no rehabilitative services particularly available in the juvenile court that would apply to defendant. Ederle explained that residential placement facilities, only available in the juvenile system, were virtually nonexistent for a child charged with this offense. She conceded, however, that she did not contact any residential facilities regarding the placement of defendant.

The last key witness at the transfer hearing, probation officer Carol Zientek, worked within a specialized unit that focused on placing juveniles in residential facilities. Zientek recommended retaining defendant within the juvenile system because she would benefit from ongoing psychotherapy. Since the Department of Corrections simply reviewed mental status without providing direct psychological services, Zientek opined that this adult system would not fulfill defendant's needs. Instead, Zientek believed that a residential placement facility would be the best option for defendant.

As far as the availability of such services, Zientek suggested three out-of-state facilities for young women: Excelsior in Colorado, Yellowstone Treatment Center in Montana, and Benchmark in Utah. However, Zientek conceded that such facilities might deny defendant admission because private centers can draw the line at violent offenders. Given defendant's background and the seriousness of the crime, Zientek stated, "I believe there would be a place for her. I'm not sure."

If defendant were accepted at such a facility, the court probed as to whether Zientek believed defendant could be rehabilitated within seven years, before attaining majority. Zientek replied:

> "Judge, my own experience as a probation officer tells me we can only bring a child to those programs in the hope that they would be rehabilitated. Many of the, of the programs that I mentioned are very good programs and they will work with youngsters; but, the expectation is that there would be some change in attitude and behavior with that child in certainly a space of 7 years, but as a probation officer I know that children can go into programs like that and fail. We are all part of that."

Finally, Zientek acknowledged that nothing requires a juvenile delinquent to accept rehabilitation services after the age of 21.

After considering each statutory factor, the juvenile court primarily expressed concern that rehabilitation services in the juvenile division would end when defendant reached majority. The juvenile court then granted the State's motion to transfer defendant to criminal court.

## SUPPRESSION HEARINGS

Both Detective William Johnston and youth officer Stephen Joyce testified at the hearings for motion to quash defendant's arrest and motion to suppress her statements.

Detective Johnston stated that when he went to the victim's home on August 21, 1994, he determined that the point of entry was the bedroom window because the screen was cut and a chair was directly underneath the window. Next, he interviewed neighbors, including Mr. Kalseth and Mrs. Greco. Mr. Kalseth, the victim's next-door neighbor, told Detective Johnston that, a few days before the murder, he observed a young white girl with a young black boy walking around the neighborhood. That afternoon, he saw the boy knock on the victim's door and ask the victim for water, while the girl sat on the sidewalk down the street. On the night before the murder, he saw them on the victim's property. Becoming suspicious, he yelled at the kids and called 911.

Detective Johnston also spoke to Mrs. Greco, who lived 10 houses away from the victim. She told Johnston that she saw a white female and a black male sitting on her front steps on two separate occasions—both on the day before and the day of the murder. On the day before the murder, she spoke to them and they identified themselves as "Corey" and "Dori."

Detective Johnston spoke to youth officer Joyce, who told him that a white female, Dorleena Kolakowski, known as "Dori," was reported missing and was supposed to be with her boyfriend Corey. Johnston then went to the Kolakowski home and spoke with defendant's mother, who told him that defendant was still missing and was likely with her boyfriend, Corey West. Johnston finally went to West's home, and West said that he would help the officers find the defendant. The officers checked the neighborhood, found the defendant two blocks from her home, and took her to the police station.

As they walked into the station at 4:30 p.m., Detective Johnston requested another officer to notify youth officer Joyce. Before giving defendant *Miranda* warnings, Johnston initially questioned defendant about her runaway status and her boyfriend. He then asked her a few questions related to the murder investigation. Specifically, he asked her if she or West ever asked an old man who lived near Blackhawk

Park for water. When defendant assented, he asked if they had ever gone onto the old man's property. Defendant responded that she and West had walked into the backyard of his property when a male neighbor shouted that they should leave. At this point, Johnston read defendant her *Miranda* rights for the first time. He could not recall whether youth officer Joyce was present at this moment. He did state that Officer Joyce came into the interview room a couple of minutes after defendant and Detective Johnston were seated in there.

Youth officer Joyce testified that on August 22, 1994, around 5 p.m., he was informed that defendant was found and had been brought to the police station. Officer Joyce called defendant's mother, then 15 to 20 minutes later went to see defendant in the interview room. He heard the detectives give defendant *Miranda* warnings before defendant gave an oral statement. He came back to visit defendant three more times that evening: first, between 6:30 p.m. and 8 p.m. to check on her welfare; second, around 10:45 p.m. when defendant gave an oral statement to an assistant State's Attorney; and third, around 12:30 a.m. when defendant gave a court-reported statement. Officer Joyce further testified that he was present during all three statements that defendant gave to law enforcement officials. He stated that, before each statement, defendant was fully advised of her *Miranda* rights.

Officer Joyce also stated that he met defendant's father in the police station waiting room some time between 6:30 p.m. and 8 p.m. Officer Joyce gave defendant's father notice of defendant's scheduled court appearance the next day. There is conflicting testimony as to whether the father was denied access to his daughter. Both Officer Joyce and Detective Johnston allege that they asked the father separately whether he wanted to see his daughter, and he indicated that he wanted to leave. In contrast, the father testified that officers told him he could not see his daughter and to go home, even though he specifically asked to see her.

Dr. Leska, a clinical psychologist, also testified at the suppression hearing. Based on her examination of the defendant, Dr. Leska believed that defendant did not fully understand her *Miranda* rights, nor did she appreciate the consequences of relinquishing those rights. Test results indicated that defendant had an IQ of about 80, which was in the low average range of intelligence. Dr. Leska also found defendant to have poor abstract thinking ability. On cross-examination, Dr. Leska admitted that defendant scored several points higher on IQ tests administered by another psychologist, Dr. Levy.

The trial court found that police had probable cause to arrest defendant when they picked her up and that her subsequent statements were voluntary. The trial court denied defendant's suppression motions.

## TRIAL

At trial, defendant's court-reported statement was read into the record. According to the statement, the following events took place on the evening of August 20, 1994. After playing basketball in Blackhawk Park with her boyfriend, Corey West, the defendant and West went to the alley behind the victim's house, which they planned to break into. They entered the victim's house through his bedroom window. Defendant slit the window's screen with a knife and entered the house first, followed by West. They crawled on the floor and found the victim asleep in a chair in front of the television.

Defendant followed West's instructions and returned with a pillow from the bedroom. West took the pillow and put it over the victim's face, causing him to struggle. West then told defendant to hold the pillow down, which she did, until the victim pushed her off. Meanwhile, West retrieved a brick from the bedroom, which they had brought with them from the alley.

West hit the victim in the middle of the upper forehead with the brick about 10 times, causing the victim to choke on his blood. West told defendant to get a knife. She got one from the kitchen, but when West told her to stab the victim, she refused. So, West took the knife from her and stabbed the victim about four times, until the victim stopped choking on his blood.

After the stabbing, they went to the bathroom where West washed off some blood and defendant washed the knife. While they were in the house, a man rang the bell to the side door. Defendant answered and the man told her that the garage door was open. She thanked him and he left. Before leaving the house, defendant and West ate some food in the kitchen and took some money, clothes, food and suitcases with them. In the alley behind the house, defendant dropped a plastic bag into the garbage which contained the butcher knife that West had used to stab the victim. They proceeded to West's house and divided the stolen goods in his basement, with defendant getting a radio. It, together with everything else, was left stored in West's basement. Following a bench trial, defendant was convicted and sentenced to 40 years in the Department of Corrections.

## ANALYSIS

## I. TRANSFER MOTION

■ Initially, defendant contends that the juvenile court abused its discretion by transferring the case to criminal court. Section 5—4(3)(b) of the Juvenile Court Act of 1987 lists eight factors that the juvenile court must consider in reaching its decision on whether to prosecute a particular minor as an adult under the criminal laws. 705 ILCS 405/ 5—4 (West 1996). The factors are:

"(i) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (ii) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (iii) the age of the minor; (iv) the previous history of the minor; (v) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; (vi) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority; (vii) whether the minor possessed a deadly weapon when committing the alleged offense; and (viii) whether the alleged offense is a felony offense under Section 5 of the Cannabis Control Act committed while in a school[.]" 705 ILCS 405/5—4(3)(b) (West 1996).

Where the juvenile judge considers evidence on the various statutory factors, the resulting decision is a product of sound judicial discretion which will not be disturbed on review. *People v. Clark*, 119 Ill. 2d 1, 14, 518 N.E.2d 138 (1987). "It is not necessary that all factors be resolved against the juvenile in order to allow transfer." *People v. Cooks*, 271 Ill. App. 3d 25, 39, 648 N.E.2d 190 (1995). A reviewing court's function is not to reweigh all of the factors, but to determine whether the juvenile court abused its discretion. *People v. Brown*, 301 Ill. App. 3d 995, 1004, 705 N.E.2d 162 (1998).

The defendant argues that, like *Clark*, the juvenile court merely recited the factors without further analysis. In *Clark*, the defendant was a 14-year-old minor indicted for a double murder committed during the course of a residential burglary. The juvenile court granted the State's motion to have defendant tried as an adult and the appellate court affirmed. *Clark*, 119 Ill. 2d at 4. The Illinois Supreme Court reversed, however, holding that the transfer hearing was inadequate for three reasons. First, no consideration was given to a critical nonstatutory element—conviction for a double murder would result in a mandatory sentence of natural life imprisonment. *Clark*, 119 Ill. 2d at 15. There was "not one scintilla of evidence" that the assistant State's Attorney, defense counsel, or the juvenile judge was even aware that defendant would be incarcerated for the remainder of his natural life if convicted as an adult of the two murders. *Clark*, 119 Ill. 2d at 15-16.

Second, the court found that the judge gave virtually no consideration to the fourth factor, the previous history of the defendant, especially as it related to his potential for rehabilitation. While evidence was presented that defendant had no criminal history except for very minor station adjustments, the court admonished that no inquiry was undertaken to ascertain the defendant's physical or mental health,

except for a short statement by defendant's mother that he was her only source of help at home. *Clark*, 119 Ill. 2d at 9-11, 17-19.

Third, the court noted the failure to investigate the availability of rehabilitation services. *Clark*, 119 Ill. 2d at 16. The juvenile judge only heard the opinion of a juvenile probation officer who stated that he was unaware of any facilities. However, no inquiry was made about the basis for this opinion. Furthermore, the probation officer did not know the defendant and never spoke to him relative to the incidents giving rise to the transfer hearing. *Clark*, 119 Ill. 2d at 19. For all of these reasons, the court held that there was an inadequate transfer hearing.

■ The instant case has some similarities to *Clark*. Defendants were 13 and 14 when they were indicted for murder committed during the course of a residential burglary. However, *Clark* is distinguishable in several key respects. First, unlike *Clark*, the juvenile judge here was aware of the sentencing possibilities in adult court. The parties stipulated that if defendant was convicted of murder she faced a term of 20 to 60 years and if the murder was found to be accompanied by exceptionally brutal or heinous behavior, the court, in its discretion, could sentence defendant to natural life imprisonment. The judge even asked for the citation of the sentencing statute, 730 ILCS 5/5—8—1 (West 1998). Also, unlike *Clark*, a natural life term was not mandatory. Instead, if defendant was convicted of murder, the trial court had discretion to impose such a sentence upon a finding of exceptionally brutal or heinous behavior.

*Clark* is also distinguishable in the consideration of the fourth factor. In *Clark*, the juvenile judge was presented with no information concerning defendant's personal or social history. In contrast, the juvenile judge here heard extensive testimony from Dr. Fink, a pediatric psychiatrist. The parties also stipulated to a report prepared by Dr. Levy, a court-appointed psychiatrist. The juvenile judge also heard from a probation officer, Janet Ederle. Unlike the probation officer in *Clark*, Ederle had extensive contact with defendant's family and had conducted a social investigation of her after the crime. Based on this testimony, the juvenile judge concluded that, although defendant had no previous history of criminal activity, she was raised in a violent family and had learned the value of aggression for asserting control.

Finally, unlike *Clark*, the juvenile judge heard testimony concerning the availability of rehabilitative services. In fact, probation officer Carol Zientek was especially called to testify about matters related to the fifth factor. Defendant argues that the court ignored the abundant psychological evidence recommending retention and the availability of residential facilities. Instead, according to the defendant, the court

relied upon the "valueless" opinion of probation officer Janet Ederle, stating that defendant had no psychological problems and that no placement facilities existed for such a violent offender. We find that defendant mischaracterizes the juvenile court's analysis.

In its 14-page discussion of the transfer motion, the court devoted three pages to the psychological analysis of Dr. Fink and Dr. Levy. While the court acknowledged Dr. Fink's recommendation for a residential facility, the court noted that Dr. Fink made no reference to its availability. The court also commented on probation officer Zientek's testimony as follows:

> "Now, I recognize she was a specialist in this field but even she was not able to tell us that there was any facilities or residential placement that the minor could be placed. She could only at best do what I would characterize as speculate."

Given the serious nature of the offense, Zientek could not be certain that out-of-state residential facilities would accept defendant. Although probation officer Ederle conducted no investigation to support her opinion concerning the lack of residential placement facilities, the court did not rely upon Ederle's opinion when it considered the fifth factor.

The record further indicates that the court carefully considered the other factors relevant to this case. First, the juvenile court noted that sufficient evidence existed to support a grand jury indictment where defendant's signed statement and corroborating evidence indicated her involvement in the offenses. Second, the court found defendant's use of a pillow to hold the victim down before he was struck with a brick and stabbed by her partner to be an aggressive act. The victim in *Clark* was struck because she was getting up and defendant was afraid she would recognize him. *Clark*, 119 Ill. 2d at 9. In contrast, the victim here was still sleeping when he was killed.

Third, the trial court concluded that defendant was no stranger to adult experiences, even though she was only 13 at the time the offenses were committed. She had a boyfriend with whom she was intimate; she had joined a gang at age 11; her parole officer opined that she knew right from wrong; and she had reached the legislatively established minimum age for transfer.

Finally, defendant argues that the juvenile court ultimately and erroneously based its decision on the sixth factor. This factor requires a balancing of the competing interests of the minor and society and recognizes that it may be necessary to incarcerate the juvenile beyond her minority. *People v. Martin*, 285 Ill. App. 3d 623, 635, 674 N.E.2d 90 (1996). While the judge commented upon the minimum sentence defendant would receive in criminal court, he was aware of the maximum

penalty that defendant could face, as noted above. The judge was primarily concerned that defendant would require incarceration beyond minority. Lastly, the court reasonably characterized the butcher knife and brick used to kill the victim as deadly weapons.

In our view, the juvenile court considered the evidence for each statutory factor and did not abuse its discretion by transferring the case to criminal court.

## II. QUASH ARREST

■ Next, defendant argues that her fourth amendment (U.S. Const., amend. IV) rights were violated because she was warrantlessly arrested on a lucky hunch, not probable cause. The State responds that officers had probable cause to arrest defendant at the time she was picked up as a runaway. Even if police lacked probable cause, the State further contends that the police were authorized to take defendant into limited custody pursuant to section 3—4 of the Juvenile Court Act (705 ILCS 405/3—4 (West 1998)). We agree with the State's position that the police had authority to take defendant into limited custody as a runaway.

Section 3—4 of the Juvenile Court Act provides in pertinent part:
"Taking into limited custody.

(a) A law enforcement officer may, without a warrant, take into limited custody a minor who the law enforcement officer reasonably determines is (i) absent from home without consent of the minor's parent[s] ***.

(b) A law enforcement officer who takes a minor into limited custody shall (i) immediately inform the minor of the reasons for such limited custody, and (ii) make a prompt, reasonable effort to inform the minor's parents, guardian, or custodian that the minor has been taken into limited custody and where the minor is being kept.

(c) If the minor consents, the law enforcement officer shall make a reasonable effort to transport, arrange for the transportation of or otherwise release the minor to the parent, guardian or custodian. ***

***

(e) No minor shall be involuntarily subject to limited custody for more than 6 hours from the time of the minor's initial contact with the law enforcement officer.

(f) No minor taken into limited custody shall be placed in a jail, municipal lockup, detention center or secure correctional facility.

(g) The taking of a minor into limited custody under this Section is not an arrest nor does it constitute a police record ***." 705 ILCS 405/3—4 (West 1998).

Detective Johnston was authorized to take defendant into limited custody because defendant's mother had reported her missing.

Defendant argues that Johnston violated section 3—4 by not taking defendant home immediately, especially when he knew that she lived two houses away and that her mother was at home. However, nothing in the statute indicates that this is mandated procedure. In fact, youth officer Joyce testified that it is customary to take a juvenile directly to the police station to complete a missing persons report. Moreover, Detective Johnston arrived at the police station with the defendant at 4:30 p.m, and within 30 minutes her parents were timely notified of her whereabouts. Since police had authority to hold defendant in limited custody as a runaway, we decline to review the issue of whether police had probable cause to arrest defendant when she was initially picked up. Thus, the trial court properly denied defendant's motion to quash her arrest.

## III. SUPPRESS STATEMENTS

Defendant also contends that her in-custody statements were not voluntary and should be suppressed for three reasons: (1) an interested adult was not present to safeguard her constitutional rights; (2) her waiver of *Miranda* rights was not knowing or intelligent; and (3) she was not given *Miranda* warnings at the appropriate time before initial questioning. We shall first consider each of defendant's arguments before reviewing *de novo* the ultimate question of whether the confession was voluntary.

In a recent opinion, the Illinois Supreme Court adopted a new standard of review for determining whether a confession is voluntary. *In re G.O.*, 191 Ill. 2d 37, 49, 727 N.E.2d 1003 (2000). Rather than the previous manifestly erroneous standard, the court held that the question of whether a confession is voluntary would be subject to *de novo* review. *In re G.O.*, 191 Ill. 2d at 49. The court noted that the voluntariness of a confession presents a mixed question of law and fact. The court explained:

> "Consequently, in reviewing whether respondent's confession was voluntary, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. However, we will review *de novo* the ultimate question of whether the confession was voluntary." *In re G.O.*, 191 Ill. 2d at 50.

Thus, questions of fact—like whether a *Miranda* waiver was knowing and intelligent—would still be reviewed under a manifestly erroneous standard. *In re M.W.*, 314 Ill. App. 3d 64, 69, 731 N.E.2d 358 (2000). However, the ultimate question of whether defendant's confession was voluntary is now subject to *de novo* review.

■ In assessing the voluntariness of a juvenile's confession, courts must take great care to assure that incriminating statements were neither coerced or suggested, nor a product of fright or despair. *People v. Knox*, 186 Ill. App. 3d 808, 812, 542 N.E.2d 910 (1989). Courts look at the totality of the circumstances in determining whether a statement or confession was voluntary. *In re J.J.C.*, 294 Ill. App. 3d 227, 234, 689 N.E.2d 1172 (1998). Factors to consider include the age, intelligence and education of the accused; length and intensity of the interrogation; whether *Miranda* warnings were given; and the existence of any threats, promises or physical coercion. *In re Lashun H.*, 284 Ill. App. 3d 545, 550-51, 672 N.E.2d 331 (1996); *In re R.T.*, 313 Ill. App. 3d 422, 428, 729 N.E.2d 889, 894 (2000). In cases involving juveniles, courts consider additional factors, such as the time of day and the presence of a parent or other adult concerned about the juvenile's welfare. *In re J.J.C.*, 294 Ill. App. 3d at 234.

## A. "Concerned Adult" Factor

■ First, defendant contends that her in-custody statements were involuntary because there was no concerned adult present during her confessions. Specifically, she argues that her father was denied access to her and youth officer Joyce was simply another adversarial police officer who did not assist her. "The presence or absence of a parent is a factor to consider when determining the voluntariness of a confession; however, there is no *per se* rule that a parent or guardian be present." *In re J.J.C.*, 294 Ill. App. 3d at 235. There is conflicting testimony as to whether police prevented defendant's father from seeing his daughter. We defer to the trial court's determinations of witness credibility. *In re R.T.*, 313 Ill. App. 3d at 428-29. Since the trial court found the testimony of the State's witnesses more credible, we shall not disturb that finding on review.

Additionally, Joyce fulfilled his role as youth officer. He timely notified defendant's mother of defendant's custody and was told that defendant's father would come to the station. Specifically, defendant arrived at Area 5 police headquarters around 4:30 p.m. and her father confirmed that he was notified sometime between 4:15 p.m. and 4:45 p.m. of her presence there. When defendant initially confessed to the murder around 5:30 p.m., Officer Joyce did not call her parents again because he believed that her father was on his way. Next, Joyce was present at all of defendant's interrogations, although there is no statutory requirement that a youth officer be present when a minor is questioned. *People v. Bobe*, 227 Ill. App. 3d 681, 703, 592 N.E.2d 301 (1992). He also checked to make sure that she was fed and treated properly. See *People v. Plummer*, 306 Ill. App. 3d 574, 588, 714 N.E.2d

63 (1999) (youth officers should be required to see that juveniles are properly treated—that they are fed, allowed to rest if necessary and given washroom facilities).

We note that the Illinois Supreme Court found the "concerned adult" factor particularly relevant in the following situations: (1) the juvenile has trouble understanding the interrogation process; (2) she asks to speak to her parents or another "concerned adult"; or (3) the police prevent the juvenile's parents from speaking to her. *In re G.O*, 191 Ill. 2d at 55. In the instant case, there is no evidence that defendant had trouble understanding the questioning process; she never asked to speak to her parents; and the trial court found that police did not prevent defendant's father from seeing her. Thus, while the presence of a "concerned adult" is certainly a significant factor, it does not weigh heavily in defendant's favor in this particular case.

## B. Waiver of *Miranda* Rights

■ Next, defendant asserts that her statements should be suppressed because she did not understand her *Miranda* rights. We disagree. A recent opinion, *In re M.W.*, 314 Ill. App. 3d 64, 731 N.E.2d 358 (2000), is instructive on this issue. In *In re M.W.*, the appellate court affirmed the trial court's decision that the respondent did not make a knowing and intelligent waiver of his *Miranda* rights based on the following set of facts. While respondent was $13^{1}/_{2}$ years old at the time of his arrest, he had an average IQ of 53. This placed him in the borderline mentally retarded range of intellectual functioning. *In re M.W.*, 314 Ill. App. 3d at 69. Two years after his arrest, respondent's reading scores were only at third-grade level, seven years below his grade level. *In re M.W.*, 314 Ill. App. 3d at 69. Also, the evidence showed that respondent was unable to define the terms "right" and "silent." *In re M.W.*, 314 Ill. App. 3d at 70.

We find *In re M.W.* distinguishable from the instant case. Here, the defendant was the same age as M.W. at the time of arrest, but her IQ was at least 30 points higher than M.W's. Defendant's score indicated that she was of low to average intelligence, not borderline mentally retarded like M.W. Defendant was also reading at the normal eighth-grade level appropriate for her age. Additionally, defendant defined *Miranda* warnings in her own words in her court-reported statement, while M.W. was unable to explain the meaning of basic words like "right" and "silent."

Although defendant presented expert testimony that she could not comprehend *Miranda* warnings, it was for the trial court to decide what weight to accord the psychological expert testimony. *In re R.T.*, 313 Ill. App. 3d at 429. We conclude that the trial court's finding that

defendant knowingly and intelligently waived her *Miranda* rights was not against the manifest weight of evidence.

### C. Inadequate *Miranda* Warnings

Defendant also argues that the initial failure of law enforcement officers to administer *Miranda* warnings the moment they began to question her about the homicide rendered her subsequent, court-reported confession inadmissible. The defendant gave three confessions during questioning on August 22, 1994: two oral statements around 5:30 p.m. and 10:45 p.m, respectively, and a later court-reported statement at 12:30 a.m. The court-reported confession is the only one admitted at trial. All three confessions were preceded by *Miranda* warnings. However, before defendant's first confession around 5:30 p.m., detectives initially inquired about her runaway status. Then, they asked two questions related to the victim before they read defendant her *Miranda* rights for the first time. Detective Johnston conceded that the two unwarned admissions that he elicited from defendant at this juncture had nothing to do with her runaway status but, rather, were related solely to the homicide. We shall first consider the voluntariness of defendant's unwarned admissions, before examining whether any coercive effect from these admissions carried over into defendant's subsequent confessions, thereby rendering her court-reported statement inadmissible.

A person subject to a custodial interrogation is entitled to *Miranda* warnings—statements obtained in violation of this rule are inadmissible at trial. *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Berkemer v. McCarty*, 468 U.S. 420, 428, 82 L. Ed. 2d 317, 327, 104 S. Ct. 3138, 3144 (1984). A warned and voluntary statement is not tainted by an unwarned but voluntary statement made earlier. *People v. Stachelek*, 145 Ill. App. 3d 391, 402-03, 495 N.E.2d 984 (1986), citing *Oregon v. Elstad*, 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985). When a prior statement is actually coerced, however, the following factors bear on whether that coercion has carried over into the second confession: the time that passes between confessions; the change in identity of the interrogators; and the change in place of interrogations. *Oregon*, 470 U.S. at 310, 84 L. Ed. 2d at 232-33, 105 S. Ct. at 1293. Thus, the voluntariness of a prior, unwarned statement is significant in determining whether a subsequent confession is tainted.

In the instant case, despite her runaway status, defendant

was "in custody" for purposes of *Miranda* from the moment detectives began questioning her about the homicide. Thus, her unwarned admissions would have been inadmissible. We consider that she was a 13-year-old girl and that, initially, while in custody as a runaway, she was without a youth officer's presence. She had not been "Mirandized" when she gave answers to the first two questions the detective asked her relative to the homicide. As such, in our view, because defendant had not then knowingly waived her *Miranda* rights, these first responses were tainted and excludable at trial.

Next, we consider if the defendant's unwarned admissions had any coercive effect on her first confession. After responding to two questions relative to the homicide, the defendant was "Mirandized" and the youth officer arrived. Questions then continued and defendant made the first oral confession. In our view, the first confession was voluntary for two key reasons. First, defendant's unwarned admissions did not "let the cat out of the bag." See *Oregon*, 470 U.S. at 311, 84 L. Ed. 2d at 233, 105 S. Ct. at 1294. Although her unwarned admissions to the detective confirmed that she was the young white girl who had been seen on the victim's property on a prior occasion and had been present when West asked the victim for water, her response was not a confession. Also, her unwarned responses were not involuntary.

Second, defendant herself testified at trial that the only reason she confessed was because detectives told her that West, who was being questioned at the same time across the hall, did not care about her. She admitted that she did not confess because officers told her to "cut the bullcrap." From her own testimony, we find that defendant's first confession did not result from the police's coercive behavior. See *Oregon*, 470 U.S. at 304-05, 84 L. Ed. 2d at 228-29, 105 S. Ct. at 1290-91 (the fifth amendment (U.S. Const., amend. V) is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion). Since defendant's unwarned admissions did not taint her first confession, we conclude that defendant's next two confessions were similarly untainted. Thus, the police's initial failure to administer *Miranda* warnings did not require the suppression of the subsequent court-reported statement.

### D. Weighing Totality of the Circumstances

■ Weighing against admission is defendant's tender age and her lack of prior history or contact with the justice system. Defendant argues that she was not informed of her father's presence at the station, but she conceded that she never requested to see her family.

On the other hand, there is substantial evidence weighing in favor of admission. Defendant defined the *Miranda* warnings in her own

words, and her answers reflected understanding. A youth officer was present for all questioning. Although defendant was in the interview room for almost eight hours, she was only questioned briefly on three occasions. In fact, her first and second interviews only lasted 30 minutes and 15 to 20 minutes, respectively. Furthermore, defendant acknowledged that she was not handcuffed, had been treated "nicely," was given something to eat and drink and was allowed to use the washroom. She reread her signed statement and was allowed to make corrections. Given the totality of the circumstances, we conclude that defendant's confession was the result of her own decision and not due to compulsion or her will being overborne.

## IV. EXCESSIVE SENTENCE

■ Defendant finally argues that her 40-year sentence was excessive. However, defendant has waived any challenge to her sentence by failing to file a postsentencing motion pursuant to section 5—8—1(c) of the Unified Code of Corrections. 730 ILCS 5/5—8—1(c) (West 1998); *People v. Reed*, 177 Ill. 2d 389, 394-95, 686 N.E.2d 584 (1997). Nevertheless, we elect to review this claim.

A trial court's sentencing determination will not be reversed absent an abuse of discretion where the judgment is "manifestly unjust or palpably erroneous." *People v. Anderson*, 112 Ill. 2d 39, 46, 490 N.E.2d 1263 (1986). While a trial court must consider a defendant's rehabilitative potential, the trial court is not required to give greater weight to that consideration than to the seriousness of the offense. *People v. Bailey*, 259 Ill. App. 3d 180, 186, 630 N.E.2d 1158 (1994).

Defendant was sentenced within the statutory range of 20 to 60 years. 730 ILCS 5/5—8—1(a)(1)(a) (West 1998). Also, the trial court properly considered aggravating as well as mitigating factors. The trial judge even commented that he was imposing a lesser sentence on defendant than on Corey West due to her age and testimony about her progressive rehabilitation. However, the court found that "the minimum sentence is not warranted in this case" because of the seriousness of the offense and the manner in which the victim's life was taken. Since defense counsel argued factors in mitigation, and the record indicates that the trial court considered those mitigating factors, we hold that the trial court did not abuse its sentencing discretion.

For the foregoing reasons, the trial court's decision is affirmed.

Affirmed.

CAHILL, P.J., and GORDON, J., concur.