THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JONATHAN TOLLIVER, Defendant-Appellant.

First District (5th Division)    No. 1—01—3147

Opinion filed March 12, 2004.—Rehearing denied April 22, 2004.

Richard P. Steinken and Christopher M. O'Connor, both of Jenner & Block, and Melissa C. Brown, of Foley & Lardner, L.L.P., both of Chicago, for appellant.

Richard A. Devine, State' s Attorney, of Chicago (Peter Fischer, Assistant State's Attorney, of counsel), for the People.

JUSTICE O'BRIEN delivered the opinion of the court:

We affirm defendant Jonathan Tolliver's convictions for the first degree murder of Michael Ceriale and for possession of a controlled substance with intent to deliver and his concurrent sentences of 60 years' and 15 years' imprisonment.

Michael Ceriale, a Chicago police officer, was fatally shot while conducting an undercover narcotics investigation.

Defendant was tried before a jury for the murder of Ceriale, for possession of a controlled substance with intent to deliver and for criminal drug conspiracy. He was found guilty of possession with intent to deliver and acquitted of the charge of criminal drug conspiracy. A mistrial was declared on the murder charge because of a hung jury on that charge.

Defendant was retried before another jury for the murder of Ceriale, found guilty and sentenced to concurrent sentences of 60 years for murder and 15 years for possession of a controlled substance with the intent to deliver. He filed this appeal.

Upon appeal, defendant contends that: (1) the State failed to prove him guilty beyond a reasonable doubt of murder or possession of a

controlled substance with the intent to deliver; (2) the trial court erred in admitting testimony related to defendant's arrest for possession of a controlled substance with intent to deliver; (3) he was denied a fair trial by admission of excessive evidence about street gangs; (4) the trial court erred in allowing evidence of gang intimidation where no evidence of intimidation was tied to defendant; (5) he was denied a fair trial by multiple incidents of prosecutorial misconduct; (6) he was denied a fair trial by the prosecutor's closing argument; (7) the trial court abused its discretion in excluding exculpatory evidence; (8) defendant was denied a fair trial by cumulative error; (9) the trial court erred in denying defendant's motion to bar retrial on the grounds of double jeopardy; and (10) the trial court erred in sentencing defendant as an adult on the possession charge.

The trial testimony summarized here is from defendant's first and second jury trials.

## The State's Witnesses

Chicago police sergeant Mark Moore of the organized crime division, narcotic and gang investigation section, testified about the operation and security of illegal drug sales of the Gangster Disciples street gang. "Outside security" was two gang members who watched outside the building for police or for rival gang members. Inside the building, gang members known as "servers" or "holders" held the drugs and handled the sales. Another armed gang member searched people as they entered and left the building.

Security worked in two shifts and with one weapon, a .357-caliber firearm which was passed from shift to shift along with six extra bullets.

Moore testified that the drug operation at 4101 South Federal Street was controlled by the Gangster Disciples street gang. Gangs have bylaws and rules and a broken rule is a "violation." The Gangster Disciples consider "tricking" or testifying against each other as one of the worst violations. Gang members who "trick" are badly beaten or killed.

Chicago police officer Joseph Ferenzi testified that in the early morning hours of August 15, 1998, he and Chicago police officer Michael Ceriale, plainclothes partners, were conducting drug surveillance at 4101 South Federal Street. They parked their unmarked car in front of Hartigan grammar school, exited the car and walked to an elevated, wooded area called "the coal mine." The area was well lit by streetlights, wall lighting on the school, and lights on all floors of nearby 4101 South Federal Street.

Ferenzi testified that they saw three women sitting on a bench at 4101 South Federal Street, another person standing and talking to the

women and a black male in dark clothing sitting on a milk crate approximately 150 feet away. The officers thought that the male or the people on the bench were "outside security." The male on the milk crate looked in the direction of the officers, got up and walked into the breezeway. He returned to the milk crate with two other men, one a thin, light-skinned black male approximately 6 feet to 6 feet 2 inches tall wearing an orange baseball cap turned backwards, an orange jersey with a light-colored number "50" and dark pants, and the other, a black male shorter in height, with dark hair, wearing a red top with light-colored writing and light-colored shorts or overalls.

Ferenzi testified that these two males stopped and pointed at the officers. Ceriale said, "Joe, I think they made us. The guy in the orange hat and orange jersey." Ferenzi replied, "Yeah, I see him." The two males eventually walked across the grass and stopped. The male in orange clothing moved closer to the officers and looked at them.

Then, Ferenzi heard a noise "like an M80" and saw sparks flying from the outstretched hands of the male in orange clothing. Ceriale screamed and fell to the ground while the shooter and the male in red ran back into the breezeway. Ceriale said, "He shot me," referring to the male in orange.

Ferenzi did not see the face of the shooter during the shooting. Ferenzi called for an ambulance just after 3:30 a.m.

Detective James Jones testified that he spoke with Ceriale after the shooting, while Ceriale was still coherent. Ceriale told Jones that he was shot by a slender, tall, male black wearing an orange baseball cap turned backwards, an orange sports jersey with white or light lettering featuring a "zero" and another number, and dark-colored pants who ran back toward 4101 South Federal Street after the shooting.

Officers Amina Greer and Ethel Green testified that they monitored the radio call of an "officer down" and arrived on the scene at 3:40 a.m. Greer and Green had a description of the offender as a "male black wearing an orange baseball cap turned backwards and an orange jersey shirt." Green saw defendant standing with three other males in the crowd of approximately 100 people and noted that defendant matched the description. Green and Greer approached defendant, who gave his name and age as 18 years old. Defendant said he was coming from a party and going home to 4101 South Federal Street.

Green testified that defendant was fidgety, nervous, making rapid eye movements, and breathing fast and would not look at her. Green patted defendant down for weapons and found none.

Ferenzi viewed four suspects at the scene. He identified a tall, light-skinned male black wearing an orange baseball cap turned

backwards, an orange jersey with "50" in light-colored writing and dark pants as the shooter.

That male was the defendant.

At trial, six witnesses called by the State testified contrary to their prior grand jury testimony and their prior statements.

Lacole Dismuke testified contrary to her grand jury testimony and her prior statements. At trial, Lacole denied witnessing the shooting and denied telling the police about the shooting or about a Gangster Disciple drug operation at 4101 South Federal Street. She testified that she ran to apartment 810 at 4037 South Federal Street after the shot. Lacole testified that when she returned to apartment 609 later that morning, her sister showed her a gun and she handled the gun.

Lacole testified that early another morning, she was awakened by five police detectives with drawn guns who transported her to police headquarters for questioning. She testified that she was questioned for hours by Detective Jones and that Jones refused to accept that she knew nothing of the shooting. Jones repeatedly told her she was in "deep shit," which she believed meant that her fingerprints were found on the gun used in the shooting. She was afraid she would be jailed because she was already on probation for a weapon charge.

Lacole testified that Detective Jones told her what to say before the grand jury. She feared his police authority and testified to the grand jury as he suggested, although he did not threaten or touch her. Jones coached her sister and Tameesha Bolden as to their testimony also.

Lacole testified she was visited by approximately 15 relatives of codefendant Robert Brandt several days after testifying before the grand jury. The Brandts said they were angry that Lacole had testified; they threatened to "blow up" her apartment, "whip her ass," and kill her niece.

She did not immediately call the police after the Brandt incident. She later returned to the grand jury and again testified that she witnessed the shooting, and further, she testified to the incident with the Brandt family. When one of the grand jurors asked Lacole if those who threatened her were Gangster Disciples, Lacole responded, "some of them was."

Detective Jones denied that he or any officers told her she was in "deep shit." He testified that Lacole told police details concerning the drug operation at 4101 South Federal Street.

Tameesha Bolden testified contrary to her grand jury testimony and her prior statements. At trial, she denied knowing details about the shooting. She testified that her statements and grand jury testimony were from a paper given to her by Detective Rose and that

she gave the statements because police told her that they had already arrested the defendant and that she would get home quicker if she memorized the paper. She told Detective Jones that the paper was not true.

Tameesha testified that defendant was not present when she was in the breezeway at 4101 South Federal Street at 3 a.m. on August 15, 1998, but that Christopher Evans, a/k/a "Big Moose," wearing an orange jersey and orange hat and carrying a gun, was present. Tameesha testified that Big Moose brought a gun to apartment 608 and that Lacole dropped the gun out of the window.

Tameesha further testified that after her grand jury appearance, she told Reverend Deborah Jones, Sergeant McCaskey, Officer Ron Kimble, Officer James Davis and Sergeant McCaster about her false testimony to the grand jury.

Officer Joe Parker testified that he knew Tameesha from working at an after-care program. Parker stated that he saw Tameesha throw gang signs and heard her shout gang slogans on 30 to 40 occasions.

Fannie Louise Howard testified contrary to her grand jury testimony and her prior statements. At trial, she denied the information in her prior statements and her testimony before the grand jury. She testified that police yelled and cursed at her and threatened eviction and the removal of her children if she did not tell them that defendant was the shooter.

She testified she signed a false statement because she was afraid of losing her home and children. After she signed the statement, she was taken home so she could take her diabetes medicine.

Assistant State's Attorney Dan Groth testified that Howard had given him a handwritten statement and had no complaints about her treatment by the police.

Carlos Hendricks testified contrary to his grand jury testimony and his prior statements. At trial, he testified that he did not see who shot Ceriale and did not see defendant in the breezeway at 4101 South Federal Street because he was in his sister's apartment at 4037 South Federal Street at the time of the shooting. Hendricks testified that he lied about being at the scene and lied about defendant's participation in the shooting because he was afraid of the police.

Hendricks testified that two detectives questioned him about the Ceriale shooting when police picked him up for a misdemeanor and that one detective "wouldn't take no for an answer," One detective told Hendricks that if he did not identify defendant as the shooter, he would be charged with murder. Another hit Hendricks' head with a clipboard or against a wall every time Hendricks repeated his denials. Hendricks finally agreed to give a handwritten statement naming

defendant as the shooter because Hendricks was afraid he would be charged.

At trial, Detective O'Brien testified that Hendricks was never abused or threatened and that Ceriale was still alive at the time Hendricks was interviewed so Hendricks was not threatened with a murder charge.

At trial, Calvin Brown testified contrary to his grand jury testimony and his prior statements. He denied knowing what happened at the shooting because he left a party attended by defendant at 3 a.m. and spent the night with his girlfriend.

Brown testified that he went to the police station voluntarily because his "name was in the air." He was accompanied by his mother Kathryn Smith and a man named Adrian Frowner, whom he considers his stepfather. Brown testified that Detective Murray provided Brown with details of the shooting outside the presence of his mother and that detectives gave Brown a choice as the shooter: defendant or "June Bug."

After hours of rejecting police suggestions, Brown was left alone in the interview room, without food or blankets, and later placed in a cell until Detective Murray resumed questioning. Detective Murray suggested to Brown that Brown could be charged and that other witnesses had placed him at the scene. Brown then signed a statement naming defendant as the shooter. Brown had been with police for more than 20 hours.

Brown admitted that he signed the handwritten statement and read it aloud. Brown testified that sometime after his grand jury testimony, he was visited by five or six Chicago police detectives who threatened him not to change his story or recant his grand jury testimony.

Adrian Frowner testified that he and Kathryn Smith took Brown to the police station. Frowner and Smith told Brown to tell the truth. Frowner was present when the assistant State's Attorney drafted the statement and when Brown read the statement aloud and signed it. Frowner took Brown to the grand jury the following day. Brown never complained to Frowner that he was mistreated, that he was coerced into signing a statement or testifying before the grand jury or that his statement was not true.

Treyvon Louis testified contrary to his grand jury testimony and prior statements. At trial, he denied any knowledge of the shooting. He testified that he left 4101 South Federal Street at approximately 2:15 a.m., went to a truck stop to get something to eat, returned at approximately 2:30 a.m., and went to his mother's apartment in 4101 South Federal Street. He testified that after he voluntarily turned himself in to the police, he was interrogated for hours and was struck

repeatedly in the face by three white police officers until he agreed to cooperate. Louis testified that police threatened to charge him with the shooting unless he told them the story they wanted to hear. Louis also testified that he was handcuffed and not allowed to obtain his insulin medication for diabetes and that the officers threatened to "blow [his] brains out."

Louis testified that "GD" means "Growth and Development," and that he had "heard about" the Gangster Disciples. However, he admitted that he had belonged to the Gangster Disciples since he was 15 years old, that he had a tattoo on his right arm with "CPO" above a "G," that CPO was his nickname and that the "G" stood for "Gangster." Louis testified he was no longer a Gangster Disciple and he did not know if the gang sells drugs.

Assistant State's Attorney Alan Lynn testified that he took Louis's handwritten statement. Lynn advised Louis of his rights before taking the statement. Louis showed no signs of abuse and complained of none. A photograph taken of Louis showed no injuries. Louis told Lynn that he was not present during the shooting and did not find out about the shooting until the next day, and Lynn added that information to the statement. In both his signed statement and in his testimony before the grand jury, Louis stated that no threats or promises had been made to him.

The State then introduced the grand jury testimony and prior statements of these six witnesses as substantive evidence. The following is the evidence from the grand jury introduced as substantive evidence by the State.

Before the grand jury, Lacole Dismuke testified that on August 15, 1998, at approximately 3:30 a.m., she was sitting on a bench in front of 4101 South Federal Street with Lynette Dismuke and Tameesha Bolden. Calvin Brown was sitting on a crate in front of the bench. Gregory Mollet, James, George Alexander, and Robert Brandt, all Gangster Disciples (GDs), were also present. Lacole testified that drug selling went on every day in the building and that Brandt sold drugs while other GDs ran security in the back. George Alexander worked security outside in front of the building.

Lacole testified that George Alexander pointed to the cocaine and said, "on the Popsicles, Folks," meaning that inside security was to come outside with their guns, and "[t]hen JT [defendant] come out of the side door and he run over there and he shoot."

Lacole testified that Willie Hunter was also working security and was standing partially outside the door sporting a 9-millimeter gun. Defendant told Hunter to "watch my back" and said he was going to shoot. Defendant positioned himself across the street from the coal

mine, aimed straight ahead, fired one time at the coal mine and "somebody in the bushes fell." After firing, defendant yelled, "Go up, folks," meaning they should run inside.

Lacole and Tameesha then ran to apartment 609. Approximately five minutes later, defendant knocked on the door of that apartment, but he did not have a gun. Lacole later found a gun in the pantry. It was missing one bullet and smelled as though it had just been fired. Lacole wrapped the gun in a pair of shorts and put it on the shelf in the bathroom because she was scared. Later that night, Brandt came over, retrieved the gun, and threw it out the window.

Before the grand jury, Tameesha testified consistently with the grand jury testimony of Lacole. Tameesha thought the gun defendant had was a .44 Magnum.

Before the grand jury, Carlos Hendricks testified that he saw defendant shoot the gun on August 15, 1998. Hendricks stated that the gun was a .357 Magnum. Hendricks signed a statement with these facts.

Before the grand jury, Calvin Brown identified defendant as the shooter of the gun on August 15, 1998. Brown testified that defendant shot either a .357 or a .38. Brown signed a statement with these facts.

Before the grand jury, Fannie Louise Howard testified that she was home in bed in apartment 606 at 4101 South Federal Street on August 15, 1998. She heard a knock on the door and saw defendant standing in the hallway. Defendant was wearing an orange shirt and an orange hat turned backwards and held a gun in a plastic bag. Defendant asked Howard if she would hold his gun for him and she said no. Defendant had never come to her apartment before that date or asked her to hold anything for him. Howard had seen defendant working security for the drug-selling operation on prior occasions. Howard signed a statement with these facts.

Howard told the grand jury that on the night of the shooting, she told police she saw nothing because she was afraid of defendant and other Gangster Disciples.

Before the grand jury, Treyvon Louis testified that he was responsible for drug security for the Gangster Disciples on August 15, 1998, and that when he left 4101 South Federal Street at 2:30 a.m., defendant was armed and working inside security for the drug operation. Louis signed a statement with these facts.

### The State's Forensic Evidence

Dr. Eupil Choi testified that he performed an autopsy on Ceriale and that Ceriale died from shock and loss of blood as a result of a gunshot wound that hit the main vein in his leg. Dr. Choi recovered a fired bullet from behind the hip area on the right side of Ceriale's body.

Police officer James O'Brien testified that officers searched the area at 4022 South State at approximately 6:15 p.m. on August 16, 1998, for the weapon used to shoot Ceriale. The officers searched an electrical room on the thirteenth floor containing rows of electric meters and covered with Gangster Disciple graffiti. They found a Smith and Wesson .357 Magnum revolver in a space left by a missing meter. It had a blade of grass in the barrel and five live rounds; the sixth chamber was empty.

That gun and the five cartridges were transported to the State Police crime lab for tests for latent fingerprints. No prints were found.

Brian Maryland, a firearms examiner, testified that he received the fired bullet recovered from the body of Ceriale and determined that the bullet was fired from the .357 gun recovered from the electrical room at 4022 South State.

Mary Beth Thomas, a State Police crime lab forensic scientist specializing in latent fingerprints, testified that she conducted five different fingerprint tests on the .357 weapon and cartridges and found no latent fingerprints on any of the items.

Scott Rochowicz from the State Police crime lab testified that swabs taken from defendant's hands after his arrest were examined for gunshot residue (GSR). In analyzing the GSR results, an examiner looks for levels of antimony, barium and lead above the levels normally found in the environment.

The swab taken from defendant's right palm showed a barium level of .592 micrograms and a .992-microgram reading for the left palm. Both of these levels were above the barium threshold level of .4 micrograms. The levels on the back of defendant's hands were below the threshold level. Defendant's right palm swab level for lead was .389 micrograms and the left palm level for lead was .568 micrograms, both above the threshold level. The other two lead readings were below the threshold level. The four antimony readings were all below the antimony threshold.

Rochowicz testified that he was unable to form an opinion as to whether defendant had fired or handled a weapon based upon the GSR results although he could not exclude the possibility that defendant had handled a weapon because the levels of lead and barium were above the threshold.

### The State's Evidence of Possession of a Controlled Substance With Intent to Deliver

Defendant was convicted in the first jury trial of possession of a controlled substance with intent to deliver. The State introduced evidence of that arrest and the facts surrounding it as evidence in the

second jury trial for murder to show motive and identity. The testimony regarding this arrest and event was substantially the same in both the first and second trials.

Chicago police officers Michael Miller and Johnny Cavers testified about defendant's arrest for possession of a controlled substance with the intent to deliver three days before the Ceriale shooting. They testified that shortly before 11 p.m. on August 12, 1998, they were on patrol at the Robert Taylor Homes, where they saw a young male black holding a sandwich baggie containing several other colored plastic bags in the entrance of 4101 South Federal Street. The officers had seen such bags on hundreds of occasions during narcotics investigations.

Miller exited the squad car and eventually began to chase defendant. Defendant threw the sandwich bag, which landed on the fifth-floor landing. Cavers eventually retrieved the sandwich bag. It contained smaller red zip-lock bags which each contained a white rock substance. The Illinois State Police crime lab determined the white rock substance to be 7.6 grams of cocaine.

Defendant told police that he was 6 feet 3 inches tall, weighed 165 pounds and was a member of the Gangster Disciples.

### The Defendant's Witnesses

Defendant presented alibi witnesses who testified that defendant was at a party in apartment 709 at 4410 South Federal Street in the early morning hours of August 15, 1998.

Marie Carr, defendant's good friend, testified that she went to the party with defendant at approximately 12:30 a.m. and that defendant's girlfriend, Crystal Easley, did not go with them. Carr testified that she did not see defendant leave the party and that she would have noticed because he wore a bright orange shirt. Carr stayed at the party until 3:30 a.m., when the disc jockey (DJ) announced the time and said that the party was over. After the party, Carr saw defendant on a bench in front of the building as police cars came zooming down the street. Carr, defendant, and Easley walked to a gas station to get something to eat, and then returned to 4101 South Federal Street. Carr testified that there were no drugs or alcohol at the party and that at least half of the people at the party were GDs.

Pascha Marie Gray, a cousin of Easley, testified that when she arrived at the party at 12:30 a.m., defendant was already there. After the party, Gray saw defendant outside the building.

Tamika Merkson, defendant's sister's friend, testified that she saw defendant at the party but did not know if he was still there when the party ended. Merkson saw defendant after the party on the corner of Root and State Streets.

Valentino Mayo, a friend of Easley's, testified that she was at the party and that defendant arrived at the party between 11:15 and 11:30 p.m. without Easley. The party ended at 3 a.m., and the DJ did not announce the time.

Kamita Milton testified that she went to the party at approximately 10:30 p.m. and saw defendant dancing at the party. The DJ did not announce the time at the end of the party. Milton testified that she was home at approximately 3:15 a.m. and did not hear any squad cars on the street.

Donald Jenkins, a cousin of Easley, testified that he arrived at the party at midnight and saw defendant at the party. Jenkins testified that the party ended at 3:30 a.m., but admitted that he had previously told the State's Attorney investigators that the party ended at 2:30 a.m.

Jason Stampley testified that he saw defendant at the party and that the party ended at 3:30 or 3:45 a.m. After the party, Stampley walked to Root Street with defendant and saw police cars going down the street. He also testified that he was a Gangster Disciple and that defendant had been a Gangster Disciple as well. Stampley had worked the drug operation at 4101 South Federal Street and had seen defendant working inside and outside security on prior occasions.

Stampley testified that "ratting" or "snitching" on a fellow gang member was the most serious violation of the GD rules although a violator would not be killed, just "a little beat up."

Crystal Easley testified that she went to the party with defendant and several of defendant's friends. The party ended at 3:30 a.m. and Easley walked to a gas station with defendant.

Patricia Slaughter, a friend of Easley's, testified that she arrived at the party with Easley at approximately 11 p.m. Slaughter saw defendant dancing at the party. The party was over at 3:30 or close to 4 a.m. although she had previously told investigators that the party ended at 3 a.m. After the party, everyone, including defendant, sat outside for 20 to 30 minutes. Then police cars started speeding down the street.

Edna Harris testified that she lived at 4101 South Federal Street. In the early morning hours of August 15, 1998, Harris made six to seven trips down to the first floor of the building to buy crack. Harris testified that she never saw defendant out that night. She saw "Big Moose" holding a gun.

At approximately 3:30 a.m., Harris was at the ground floor of the building when she heard that "the police was getting ready to hit the building." Harris stated that she did not see defendant until a half hour later when the police swooped around him and began to "slap his

head off." Harris also told investigators that she knew defendant was downstairs with the drug-selling crew and that "Big Moose" was not the one who fired the shot.

Candace Brandt, sister of Robert Brandt, testified that on August 19, 1998, she went with a group of people to apartment 609. Brandt testified that there were no GDs in the group, and while the group was "very loud," no threats of gang retaliation were made to Howard. However, Brandt admitted that she pled guilty to an intimidation charge that she intended to cause Lacole, a/k/a Nicole, to give false testimony in a pending criminal proceeding and that she stated "she would blow up her dwelling unless Nicole came to court and gave false testimony." Brandt testified that she pled guilty to the intimidation charge because she was "in a rush to get home."

### Defendant's Forensic Evidence

Michael Kopina, of the state crime lab microscopy trace unit, testified that he conducted GSR tests on defendant's clothing and found one particle that resembled GSR on defendant's shirt. Kopina testified that one particle is insufficient to make any conclusion because at least three particles must be found to determine that clothing has been in the vicinity of a discharged firearm. Kopina admitted that he has never recovered GSR from a short-sleeved shirt such as this one and that residue is very easily removed.

### Was Defendant Proven Guilty of First Degree Murder Beyond a Reasonable Doubt?

Defendant contends that the State failed to prove him guilty of murder beyond a reasonable doubt because there was no physical evidence implicating him and because the State improperly relied on the prior out-of-court statements of six witnesses who recanted their prior testimony.

■ Upon review this court does not retry the case but examines the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

Six witnesses testified at trial that they had no knowledge that defendant was involved in the shooting of Ceriale. Their trial testimony was contrary to their prior signed statements and testimony to the grand jury. The State introduced their prior inconsistent statements as substantive evidence pursuant to section 115—10.1 of the Illinois Code of Criminal Procedure of 1963 (725 ILCS 5/115—10.1 (West 2000)).

■ Section 115—10.1 provides that a prior inconsistent statement made by a witness is admissible as substantive evidence if:

"(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording.

Nothing in this Section shall render a prior inconsistent statement inadmissible for purposes of impeachment because such statement was not recorded or otherwise fails to meet the criteria set forth herein." 725 ILCS 5/115—10.1 (West 2000).

Defendant raises three arguments regarding the prior inconsistent statements:

■ First, defendant argues that the admission of the grand jury testimony as prior inconsistent statements and substantive evidence pursuant to section 115—10.1 violated his constitutional rights of confrontation and due process. Defendant's argument is without merit. Similar arguments have been repeatedly rejected by Illinois courts of review. See *People v. Morales*, 281 Ill. App. 3d 695 (1996); *People v. Wilson*, 302 Ill. App. 3d 499 (1998).

Second, defendant argues that admitting the prior inconsistent statements was error as they were never found to be voluntary. Defendant's argument is not well taken. This court has expressly held that "if a prior inconsistent statement meets section 115—10.1's requirements, it may be admitted as substantive evidence without an independent determination of its voluntariness." *People v. Barker*, 298 Ill. App. 3d 751, 761 (1998).

Third, defendant argues that a conviction resting solely on prior inconsistent statements with no physical or other corroborating evidence supporting the conviction, especially where the recanting witness states that the original statement was involuntary and a product of police or prosecutorial misconduct, is error. In support, defendant cites *People v. Brown*, 303 Ill. App. 3d 949 (1999). In *Brown*,

the defendant was charged with a shooting. The evidence against the defendant was the statement of an eyewitness who identified defendant as the shooter, but who recanted his statement at trial. This court reversed the defendant's conviction, finding that the recanted statement lacked sufficient reliability and was insufficient alone to prove defendant guilty beyond a reasonable doubt. *Brown*, 303 Ill. App. 3d at 965.

*Brown* and the other cases cited by defendant, *People v. Parker*, 234 Ill. App. 3d 273 (1992), and *People v. Reyes*, 265 Ill. App. 3d 985 (1993), are distinguishable from the present case. In the present case, the recanted statements did not constitute the sole evidence in the case as in *Brown*, *Parker* and *Reyes*. Further, the applicable statute here is section 115—10.1, not section 115—10.2 as in *Brown*.

The State presented more evidence than just the prior statements. Officers testified that the prior statements were given voluntarily and that no promises or threats were made to the witnesses. Ferenzi identified defendant as the shooter of Ceriale. Greer and Green detained defendant after receiving information that matched the description of the suspect. The weapon that was used to shoot Ceriale was recovered from a nearby building. The grand jury testimony and signed statements of the witnesses placed defendant at the scene of the crime with a weapon consistent with the weapon used to shoot Ceriale.

Thus, the admission of the prior inconsistent statements of the six State witnesses under section 115—10.1 was not error and defendant's contention that he was not proven guilty of murder beyond a reasonable doubt is without merit.

### Was Defendant Proven Guilty of Possession of a Controlled Substance With Intent to Deliver Beyond a Reasonable Doubt?

■ Defendant contends that the evidence was insufficient to find him guilty beyond a reasonable doubt of possession of a controlled substance with intent to deliver. Our standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that the defendant had knowledge of the presence of the narcotics; the narcotics were in the immediate possession or control of the defendant; and the defendant intended to deliver the narcotics. *People v. Young*, 128 Ill. 2d 1, 49 (1989); *People v. Robinson*, 167 Ill. 2d 397, 407 (1995).

■ Defendant gives two reasons why the evidence was insufficient.

First, defendant argues that the State failed to prove he had possession of the narcotics, as the testimony of Officers Miller and Cavers regarding this issue was unbelievable and highly implausible. It is the

function of the trier of fact to determine the credibility of the witnesses and the weight to be given their testimony, to resolve conflicts in the evidence and to draw reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). Although the determinations of the trier of fact are not conclusive, they are entitled to great deference, and a conviction will be overturned only where the evidence "is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *Ortiz*, 196 Ill. 2d at 259.

Miller and Cavers testified to defendant's possession of a bag containing 30 smaller bags of cocaine. The jury had the opportunity to observe the demeanor and ability to testify of Miller and Cavers. Because it is the province of the trier of fact to determine the credibility of the witnesses, defendant's contention of error regarding the plausibility of the officers' testimony is without merit.

Second, defendant argues that there is insufficient evidence of intent to deliver.

Because direct evidence of intent to deliver is rare, intent must usually be proven by circumstantial evidence. See *People v. Friend*, 177 Ill. App. 3d 1002, 1021 (1988). Some of the factors probative of intent to deliver are whether the quantity of the controlled substance in defendant's possession is too large to be viewed as being for personal consumption and the manner in which the substance is packaged. *Robinson*, 167 Ill. 2d at 408.

Based upon the separate packaging of 30 bags and quantity of 7.6 grams of cocaine, the jury believed that defendant intended to deliver the drugs and that the drugs were not merely for his personal consumption. Defendant's contention of error is without merit.

### Was Evidence of Defendant's August 12, 1998, Arrest for Possession of Drugs Error?

Defendant contends that the evidence relating to his drug arrest on August 12, 1998, three days before the Ceriale shooting, was unfairly prejudicial, unrelated to the shooting three days later, and improperly admitted at his second jury trial to show his propensity to commit crimes.

Proof of other crimes is admissible if relevant for any other purpose than to show a propensity to commit crime. *People v. McKibbins*, 96 Ill. 2d 176, 182 (1983). Other crimes evidence is admissible to establish defendant's *modus operandi,* motive, intent, identity, absence of mistake, or other material facts if the evidence tends to make the question of guilt more or less probable. *People v. Illgen*, 145 Ill. 2d 353, 364-65 (1991). The admission of other crimes evidence is within the sound discretion of the trial court and will not be disturbed upon ap-

peal absent a clear abuse of that discretion. *People v. Franklin*, 135 Ill. 2d 78, 96 (1990).

■ The State offered evidence of defendant's August 12, 1998, arrest, three days before the Ceriale shooting, to show that defendant shot Ceriale to protect the ongoing drug-selling operation at 4101 South Federal Street and, further, to identify defendant. Thus, this evidence was not error.

### Was Evidence of the Workings of the Gangster Disciples Error?

Defendant contends that Sergeant Moore's testimony of the drug sales operations of the Gangster Disciples was excessive and unrelated to the facts of the case.

Moore had been with the Chicago police department for 11½ years and has a bachelor's degree in business administration from Chicago State University. He was assigned to the tactical unit as a plainclothes officer and to public housing south, including the Robert Taylor Homes from 1992 to 1996. During that time he investigated narcotics and gangs, spoke to over 1,000 gang members, and gathered information about gang membership, gang activity, and gang hierarchy. Moore testified as to the history of the gang, the gang symbols and colors.

Moore testified as to the general workings of the Gangster Disciples around Robert Taylor Homes buildings, including the hierarchical positions. Moore testified that he knew one of the State's witnesses, Treyvon Louis, as the brother of Kenyon Louis, the "regent" of the building, and that Kenyon appointed Treyvon as "security." Defense counsel did not object.

Moore testified at length as to rules, bylaws, slang terminology, procedures of hiding weapons and drugs, and the resulting gang "violations." The trial court instructed the jury that the testimony was to be admitted for the limited purpose of defendant's presence, motive and identification.

On cross-examination, Moore admitted that he had no knowledge of the facts of the present case and that his testimony was based upon his years of experience. He testified that he never had any dealings with defendant, and never spoke to him, although he had met defendant once, two days prior to the shooting.

■ Gang-related evidence is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. *People v. Smith*, 141 Ill. 2d, 40, 58 (1990); *People v. Hairston*, 46 Ill. 2d 348, 372 (1970). Gang-related evidence is also relevant to identification or to corroborate a defendant's confession. *People v. Gonzalez*, 142 Ill. 2d 481, 488 (1991); *People v. Murray*, 254 Ill. App. 3d 538, 554 (1993); *People v. Suarez*, 238 Ill. App. 3d 110, 122 (1991). However,

such evidence must relate to the crime charged. *Smith*, 141 Ill. 2d at 58.

Our standard of review is deferential to the trial court; a defendant must show a clear abuse of discretion resulting in manifest prejudice to the defendant to constitute error. *People v. Lucas*, 151 Ill. 2d 461, 489 (1992). Testimony regarding the background, history and criminal activity of the gangs is improper if peripheral to the offense at issue. *People v. Mason*, 274 Ill. App. 3d 715 (1995).

The trial court allowed the gang evidence as relevant and admissible for the purpose of showing motive, presence and identification. The trial court committed no clear abuse of discretion resulting in manifest prejudice to defendant.

### Was Evidence of Intimidation by Gangster Disciples Error?

■ Defendant raises two arguments regarding intimidation by the Gangster Disciples.

First, defendant contends the trial court erred in admitting evidence that a group of Gangster Disciples and relatives of codefendant Robert Brandt confronted Lacole, threatened to blow up her apartment, hurt her, and kill her niece in retaliation for her testimony against Brandt before the grand jury. However, this evidence explained why Lacole recanted her grand jury testimony against defendant at trial: she feared for her safety if she continued to testify against the Gangster Disciples. See *People v. Barajas*, 322 Ill. App. 3d 541, 556 (2001) (testimony that witnesses had been threatened or feared for their safety as a result of testifying is admissible to explain why the witnesses had given inconsistent statements). Thus, defendant's contention is without merit.

Second, defendant argues that the trial court abused its discretion by admitting evidence that the Gangster Disciples have bylaws and rules, that if a rule is broken it is considered a "violation," that a Gangster Disciple commits a violation by testifying against other Gangster Disciples, and that persons who testify against the Gangster Disciples are beaten or killed in retaliation. The trial court committed no abuse of discretion, as this evidence was relevant and admissible to show why several witnesses recanted their grand jury testimony against defendant, a member of the Gangster Disciples. Thus, defendant's contention is without merit.

### Was Defendant Denied a Fair Trial by Prosecutorial Misconduct?

■ Defendant argues that two instances of prosecutorial misconduct necessitate a new trial. First, defendant refers to the prosecutor's questioning Calvin Brown, "Did your memory get a little bit better when Ms. Brown, [defendant's] attorney, the Gangster

Disciple's attorney, was asking you?" Defendant contends that this question by the prosecutor improperly implied that defense counsel had been hired by the Gangster Disciples. The State counters that the prosecutor was merely stating that defense counsel represented defendant, a member of the Gangster Disciples—not that she represented the entire Gangster Disciples street gang. Regardless, the court sustained an immediate defense objection to the State's question and later told the jury to disregard any evidence or questions to which objections had been sustained. The court's act of sustaining a defense objection and properly admonishing the jury was sufficient to cure any prejudice from the prosecutor's isolated comment. *People v. Morgan*, 306 Ill. App. 3d 616, 632 (1999).

The second instance of alleged prosecutorial misconduct involved the prosecutor's "stage-whispering" during defense questioning of Ms. Howard and, later, "editorializing" when making objections to defense counsel's questions of Ms. Howard:

"[Defense Counsel]: You were still under the influence of alcohol and drugs when you were at the station?

A. Right.

[Defense Counsel]: Your honor, I would like to object to the comment 'who is testifying' audibly coming from the prosecution.

[Prosecutor]: I object to counsel testifying.

[Defense Counsel]: This is cross examination and I am permitted to ask leading questions. And I am asking far less leading questions than the prosecutor did on direct.

THE COURT: Just a minute. I didn't hear him say anything.

[Defense Counsel]: It was quite audible to me, and I am sure it was quite audible to the jury.

THE COURT: Your objection is sustained.

[Defense Counsel]: Thank you."

* * *

[Defense Counsel]: If you cooperated with [the police], they would take you home? You would be left alone?

[Prosecutor]: Objection. *Swear in Ms. Brown.*

THE COURT: Objection overruled.

[Defense Counsel]: If you didn't cooperate with them—

A. I would lose my kids. I would be locked up.

[Defense Counsel]: They were going to take your kids and lock you up?

[Prosecutor]: *Judge, who is testifying?*

THE COURT: Objection overruled. It's cross." (Emphasis added.)

The prosecutor's act of "stage whispering" during defense counsel's questioning of a witness, and of "editorializing" during

objections (*e.g.*, by stating "Swear in Ms. Brown" and asking the judge, "who is testifying") was improper. See *People v. Blue*, 189 Ill. 2d 99, 136 (2000) (holding that an objection is only intended to state the fact of the objection and the evidentiary basis therefor, and that the State should not editorialize when making an objection).

In *People v. Blue*, 189 Ill. 2d 99 (2000) and, more recently, in *People v. Johnson*, 208 Ill. 2d 53 (2003), our supreme court has expressly and emphatically held that a pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal of a criminal conviction. In *Blue*, the supreme court reversed and remanded defendant's murder conviction because of errors involving the improper introduction and display of the dead police officer's uniform on a headless torso, inflammatory testimony by the victim's father concerning the distress and sorrow felt by the family over the loss of the victim, inflammatory testimony from a police commander, inflammatory testimony from the prosecutors, and improper prosecutorial argument. In *Johnson*, the supreme court affirmed the appellate court's reversal of the convictions of Blue's codefendants, Clyde Cowley and Jimmie Parker, for reasons similar to *Blue*. In light of *Blue* and *Johnson*, we have carefully reviewed the record to determine whether the prosecutorial misconduct here rises to the level of reversible error. The record indicates one instance of "stage whispering," to which the trial court sustained a defense objection, and three instances of "editorializing" during objections. Unlike in *Blue* and *Johnson*, the prosecutorial misconduct here was not so repeated or egregious as to "undermine[ ] the very foundations of our criminal justice system" (*Johnson*, 208 Ill. 2d at 87) and does not rise to the level of reversible error.

## Was Defendant Denied a Fair Trial by the Prosecutor's Closing Argument?

Defendant complains of 10 separate comments made by the prosecutor during closing and rebuttal closing argument. A prosecutor is given wide latitude during closing and rebuttal closing arguments (*People v. Walker*, 262 Ill. App. 3d 796, 804 (1994)), and the style and substance of closing arguments are within the discretion of the trial court and will not be reversed upon appeal absent an abuse of discretion. *People v. Emerson*, 189 Ill. 2d 436 (2000). In reviewing the allegations of prosecutorial error, the closing arguments of both the prosecution and the defense must be examined in their entirety, and the complained-of remarks must be placed in their proper context. *People v. Cisewski*, 118 Ill. 2d 163, 175-76 (1987). A prosecutor may argue the evidence presented, or reasonable inferences therefrom, even if the

inference is unfavorable to the defendant. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993).

First, defendant contends that the prosecutor improperly argued that the recantations of the testimony of six witnesses was related to witness intimidation. These comments were proper based upon the evidence, discussed above, concerning the intimidation of Lacole and were also based upon the testimony of several of the witnesses that the Gangster Disciples beat and/or kill persons who testify against them.

Second, defendant contends that the State intentionally misrepresented scientific evidence regarding the gunshot residue tests. Specifically, defendant refers to the following comments by the prosecutor:

"The GSR? No evidence of any marking on his hands period. At all. It's not on the swab. They are microscopically examined. Nothing. The raised levels of lead and barium on the hands, on the palms of the hands, four of those readings that they can't explain. No matter what they say about the environment over there in the Robert Taylor Homes, you don't automatic [*sic*] get barium and lead on your hands every morning. They are inexplicable. They are just raised level. Not enough to say positive, but enough for concern.

Mike Kopina. On his jersey, they call him as a witness. On his jersey there is a particle of gunshot residue. It definitely came from discharging a firearm. They required three over there to say positive. But nevertheless, no matter what, after it's all said and done, he had a particle from a fired or discharged weapon on his orange jersey."

Defendant never objected to this comment at trial and therefore waived this issue for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). On the merits, the comment was properly based upon the testimony of Scott Rochowicz concerning the elevated levels of barium on defendant's hands, and on Michael Kopina's testimony that defendant had a particle consistent with gunshot residue on his shirt.

Third, defendant complains about the following comments made by the prosecutor during rebuttal argument:

"Well, take a look at this folks, Scott Rochowicz showed you when he testified, the elevated levels of the gunshot residue on the hands of [defendant].

[Defense Counsel]: Objection, your Honor. Misstatement.

THE COURT: Objection is overruled as to that. You may continue.

[The Prosecutor]: You don't get those from dancing. Okay. Scott Rochowicz told you his findings were inconclusive. He can't say yes. He can't say no. *** Scott Rochowicz said he could not exclude

[defendant] as the shooter. Outside, short-sleeved shirt, long arms, only one shot, slight breeze, running, transference. *** The activity the shooter performs immediately after the shooting, that affects gunshot residue. Can't exclude the defendant. Gunshot residue on the clothes. Are you kidding me? So what Mr. Kopina has never ever found gunshot residue, positive gunshot residue on a short-sleeved shirt. And you know why folks? Because he only goes to the cuffs, because the gunshot residue goes forward, and if you have long arms, those short sleeves are farther away from that gun. But he did find a particle, a particle that isn't supposed to be there. He found a particle that comes from the discharge of a firearm, and it was on this shirt. It was on this shirt. It was on his shirt. The shirt of a shooter. The shirt that Michael Ceriale looked at, the shirt that Joe Ferenzi looked at.''

These comments were properly based upon the testimony of Scott Rochowicz and Michael Kopina and were not error.

Fourth, defendant complains of a statement by the prosecutor that the witnesses could not explain why they did not go to the State's Attorney or the police with information that they were at a party with the defendant on the night of the shooting. Defendant waived review by failing to object to the comment. *Enoch*, 122 Ill. 2d at 186. On the merits, the comment was properly based upon the evidence at trial and was not error.

Fifth, defendant complains about the prosecutor's reference to Carlos Hendricks' testimony that police had put a gun on the table and threatened him. Defendant contends that Treyvon Louis, not Carlos Hendricks, testified to the gun on the table. Defendant fails to show how he was prejudiced by the prosecutor's misstatement; accordingly, we find no prejudicial error.

Sixth, defendant complains about the prosecutor's statement that Carlos Hendricks and Trevyon Louis had ''embellished'' their testimony from the first trial to the second trial. Defendant waived review by failing to object. *Enoch*, 122 Ill. 2d at 186. On the merits, the record indicates that, during the second trial, Hendricks and Louis testified to certain instances of police brutality that they had not mentioned during the first trial. Accordingly, the prosecutor's comment was properly based upon the evidence and was not error.

Seventh, defendant complains about the prosecutor's statement that Carlos Hendricks' and Carlos Brown's identification of the caliber gun used in the shooting proves that they were involved. The prosecutor's statement was a reasonable inference based upon the evidence and was not error.

Eighth, defendant complains about the following comments made by the prosecutor during rebuttal argument:

"Alibi. And the defendant does not have to call any witnesses, but he chose to in this case, to call someone. He called a series of people to suggest to all of you, he was at a dance. That defense is a joke. That defense don't [sic] inject doubt in this case, ladies and gentlemen. It solidifies guilt. You hold it against him for the witnesses he called and lied to you. *** It just goes to show you ladies and gentlemen, it just goes to show you, the length at which the Gangster Disciples would go through to obstruct justice. That alibi was a joke. It was a farce. It was a lie. It was a lie that would put Pinocchio to shame. It was obstruction of justice."

Defendant waived review by failing to object at trial. *Enoch*, 122 Ill. 2d at 186. On the merits, we find no error, as the prosecutor may comment on the credibility of defense witnesses, denounce a defendant's activities, urge the administration of justice and highlight the inconsistencies in defendant's arguments. *People v. Morrison*, 137 Ill. App. 3d 171, 184 (1985).

Ninth, defendant complains about the prosecutor's comment regarding defendant's attempt to portray the police as liars. Defendant waived review by failing to object at trial. *Enoch*, 122 Ill. 2d at 186. On the merits, the comment was properly based upon the evidence at trial and was not error.

Tenth, defendant complains about the prosecutor's comment that defendant's "stock" had skyrocketed, and that he had earned a badge of honor, by shooting a police officer. These comments were properly based upon Sergeant Moore's testimony and were not error.

### Did the Trial Court Improperly Exclude Exculpatory Evidence?

Defendant contends that the trial court erred in failing to admit three pieces of evidence tending to exculpate him. A trial court's decision concerning the admission of evidence will not be reversed absent a clear abuse of discretion. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001).

First, defendant contends that the trial court erred in excluding an excerpt of a police radio broadcast made at 4:18 a.m. on August 15, 1998. Defendant waived review by failing to raise this issue in his posttrial motion. *Enoch*, 122 Ill. 2d at 186. On the merits, the trial court committed no error. Defendant sought the admission of the police excerpt to show that the full description of the offender given by Ferenzi at trial was not the same as a more abbreviated description that went out over the police radio. The police excerpt was cumulative to four other portions of a police radio transmission, admitted at trial, which contained sparser descriptions of the offender. The admission of cumulative evidence is within the discretion of the trial court and its ruling will not be reversed where, as here, there was no clear abuse of discretion. *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 495 (2002).

Second, defendant contends that the trial court erred in excluding evidence of a list of names, compiled by defendant's mother, of individuals attending the party with defendant at the time of the shooting. The trial court committed no abuse of discretion, as the list was cumulative to the testimony of Marie Carr, Pascha Gray, Tamika Merkson, Valentino Mayo, Kamita Milton, Donald Jenkins, Jason Stampley, Crystal Easley, and Patricia Slaughter, all of whom testified that they attended the party with defendant.

Third, defendant contends that the trial court erred by refusing to admit testimony of Tameesha Bolden's efforts to publicly recant her grand jury testimony. Specifically, the trial court excluded testimony that on the same day Tameesha testified at the grand jury, she told a youth counselor and several police officers that she had lied. The trial court committed no abuse of discretion, as this evidence would have been cumulative to Tameesha's testimony, admitted at trial, that a couple of days after her grand jury appearance she told Detectives Rose and Jones that she had lied to the grand jury, and that she also told police Sergeant McCaster and police officers Ron Kimble and James Davis that she lied.

### Was Defendant Denied a Fair Trial by Cumulative Error?

■ Defendant argues that the cumulative effect of the trial court's errors denied him a fair trial. Defendant is rearguing the same errors which we have already found do not necessitate a new trial. Thus, defendant's contention is without merit.

### Did the Trial Court Err in Declaring a Mistrial in the First Trial and Violate the Ban on Double Jeopardy by Retrying Defendant?

■ Defendant contends that the trial court erred in determining that the jury in the first trial was deadlocked and in denying defendant's motion to bar retrial on the grounds of double jeopardy. The record shows that the trial court declared a mistrial on February 8, 2001, on defendant's first-degree murder charge.

When a trial court declares a mistrial without the defendant's consent, the State may retry the defendant only if the facts demonstrate that a manifest necessity required declaring the mistrial. *Arizona v. Washington*, 434 U.S. 497, 505, 54 L. Ed. 2d 717, 728, 98 S. Ct. 824, 830 (1978). A deadlocked jury is a manifest necessity justifying the declaration of a mistrial and the retrial of the defendant. *Arizona v. Washington*, 434 U.S. at 509, 54 L. Ed. 2d at 730, 98 S. Ct. at 832.

In determining how long a jury should be permitted to deliberate before a mistrial is declared and the jury is discharged, no fixed time can be prescribed, and great latitude must be afforded the trial court in the exercise of its informed discretion. *People v. Wolf*, 178 Ill. App.

3d 1064, 1066 (1989). In the absence of an abuse of discretion by the trial court in discharging the jury because of its failure to reach a verdict, reprosecution is not barred. *People v. Wolf,* 178 Ill. App. 3d at 1066.

In the present case, the jury sent several notes over the course of 10 days of deliberations. The notes indicated that the jury was having difficulty reaching a unanimous verdict on the murder charge. On the tenth day, the court stated:

> "The jury has sent out numerous notes, all of which in my opinion have been equivocal or contain equivocal information, some of which could be read as their being hopelessly deadlocked, but taken as a whole they are somewhat equivocal. However, it is now the tenth day of deliberation. They have indicated that there has been no change or no movement for some time now. In my judgment further deliberations on a count, they have, or counts they have not reached verdict on at this point would be futile. Therefore, and I am going to declare a mistrial if they have not reached a verdict on any count or counts as to those counts."

The jury foreman told the judge that the jury still had not reached a verdict and the judge declared a mistrial. The trial court committed no abuse of discretion, and accordingly the defendant was not placed in double jeopardy by the subsequent retrial.

Defendant argues that he should not have been retried because the evidence at the first trial was insufficient to convict him of murder. Defendant's argument is not well taken. The evidence at the first trial was identical in all material respects to the evidence in the second trial, which, as discussed above, was sufficient to sustain defendant's conviction.

## Did the Trial Court Err in Sentencing Defendant as an Adult and Not as a Juvenile?

Defendant contends that the trial court erred in sentencing him as an adult for possession of a controlled substance with intent to deliver, as defendant was only 16 years old at the time of the offense. Section 5—130(1)(a) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5—130(1)(a) (West 2000)) provides that a minor who was at least 15 years old and who was charged with any one of several offenses, including first degree murder, shall be prosecuted as an adult for that offense and for any other charges arising out of the same incident. Section 5—130(1)(c)(i) (705 ILCS 405/5—130(1)(c)(i) (West 2000)) provides that if the minor is convicted of any offense covered in section 5—130(1)(a), including first degree murder, then he shall be sentenced as an adult. Defendant was convicted of first degree murder and possession of a controlled substance with intent to deliver. Both

offenses arose out of the same incident, *i.e.*, the gang's drug-selling operation. Accordingly, the trial court did not err in sentencing defendant as an adult.

For the foregoing reasons, we affirm the circuit court.

Affirmed.

HARTIGAN, J., concurs.

PRESIDING JUSTICE CAMPBELL, concurring in part and dissenting in part:

I respectfully dissent from the majority opinion affirming defendant's conviction for first degree murder, and for sentencing defendant as an adult on his conviction for possession of a controlled substance. I would reverse defendant's conviction for murder, remand this matter for a new trial on the murder charge, and also remand this matter for a new sentencing hearing on defendant's drug conviction.

## I

The majority's conclusion that "[b]oth offenses arose out of the same incident" (347 Ill. App. 3d at 229-30) is not borne out by the record. It is clear from the evidence on appeal that defendant's arrest for possession of a controlled substance with intent to deliver is distinct and wholly unrelated to the shooting death of Officer Ceriale. In addition, the majority has failed to detail the procedural history explaining how "identical" testimony from the first trial, a mistrial which failed to sustain a conviction for murder, was allowed during defendant's second trial. I find that the evidence of the drug offense constitutes improper admission of other crimes evidence.

In general, evidence of other crimes is not admissible if it is relevant merely to establish the defendant's propensity to commit crime. *People v. Kliner*, 185 Ill. 2d 81, 146 (1998); *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Evidence of a defendant's commission of other crimes is admissible where relevant to prove any material question other than the defendant's propensity to commit crime, including *modus operandi*, intent, identity, motive, or absence of mistake. *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991). In considering the admissibility of other crimes evidence, the trial judge must weigh its probative value against its prejudicial effect on the defendant, and may exclude the evidence if its prejudicial effect substantially outweighs its probative value. The trial court's ruling as to the admissibility of other crimes evidence will not be reversed absent a clear showing of abuse of discretion. See *Illgen*, 145 Ill. 2d at 364.

In applying the above principles to the present case it is clear that the trial court improperly merged defendant's drug offense into the trial on defendant's charge for murder, thereby erroneously admitting evidence of other crimes. The State's theory of the case, that the murder of Officer Ceriale grew out of a drug sale operation, is speculative at best. The evidence shows that defendant shot at an individual who was hidden in a "wooded area" at 3 a.m. There is no evidence connecting the shooting of Officer Ceriale to any purported drug sale operation three days earlier. The merging of these two unrelated offenses into one trial was highly prejudicial to defendant.

In furtherance of the improper merging of the two offenses, the State submitted the testimony of Sergeant Moore, who testified in great detail as to the alleged drug sales operations of the Gangster Disciples at 4101 S. Federal and its neighboring buildings. Sergeant Moore's testimony was excessive, unrelated to the facts of the State's case for first degree murder, prejudicial to defendant and therefore improperly admitted.

Police testimony regarding gang activity is admissible if (1) it qualifies as expert opinion; (2) it is relevant, and (3) its prejudicial effect does not outweigh its probative value. *People v. Cruzado*, 299 Ill. App. 3d 131, 141, 700 N.E.2d 707, 714-15 (1998). The testimony of Sergeant Moore did not meet any of the above three elements of admissibility.

The record shows that the State failed to lay a proper foundation for admission of the testimony of Sergeant Moore as an expert regarding the gang-related drug-selling operations at the buildings located at 4101 S. Federal and 4037 and 4022 S. State. Sergeant Moore testified that he had a bachelor's degree in business administration from Chicago State University and was an 11-year veteran of the Chicago police department, working as a plainclothes officer for four years in Chicago Housing Authority buildings. Based on this limited "experience," and despite the fact that Moore did not know of defendant until two days prior to the shooting, Moore was permitted to testify as to the detailed inner workings of the Gangster Disciples drug operation at these Robert Taylor Homes, including which specific individuals worked "security" and the actual hours of security "shifts," where drugs were kept, where weapons were hidden, "codes of honor," "violations," and the estimated gross daily receipts from drug sales as $2,300. Although upon defense objection the trial court instructed the State that it would admit no further evidence regarding violations, Moore had already offered his "opinion" as to gang symbols, slogans, history, structure, and even asserted that small "Ziploc" bags have no use other than to serve as containers for drugs. Moore admitted that

he had no knowledge of the facts of the present case and that his testimony was based upon his "years of experience." Moore testified that he never had any dealings with defendant and never spoke to him.

Second, Moore's testimony was as irrelevant to the evidence at trial, as was the State's theory of the case to the evidence at trial. The majority correctly states that "[g]ang-related evidence is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act." 347 Ill. App. 3d at 221. However, the majority also states that "such evidence must relate to the crime charged." 347 Ill. App. 3d at 222; *People v. Davenport*, 301 Ill. App. 3d 143, 151, 702 N.E.2d 335, 342. Such is not the case here. The evidence here revealed only that defendant shot through the shrubbery after seeing some sort of movement. There was no evidence that defendant even knew that there was a police officer in that wooded area, there was no evidence of the shooting as related to a purchase and sale of drugs, and no evidence of witnessing the exchange of merchandise. There is no evidence that defendant, at age 16, was any sort of drug tycoon or chief executive officer of the Gangster Disciples. There is, alas, no evidence of any gang-related motive to the shooting of Officer Ceriale which would support admission of Officer Moore's testimony. Under the specific facts of this case, it is it is clear that the prejudicial effect of Moore's testimony far outweighed its probative value.

The facts of case are palpably distinct from the case *People v. Clifton*, 342 Ill. App. 3d 696 (2003), upon which the State relies,[1] and where all of the above three elements of *Cruzado* were found to have been fulfilled at trial. *Clifton* involved the murder of Leon Holton and the attempted murder of Eddie Brown. The evidence at trial revealed that both the defendants and the victims were notorious members of the Gangster Disciples street gang. The State's theory of the case was that the murder and attempted murder resulted from the federal indictment of 39 other Gangster Disciple gang members on August 31, 1995, and the "jockeying" among remaining gang members for leadership positions.

Detective Thomas Richardson was certified as a gang expert based on the following qualifications: he was a Chicago police officer for 27 years and a "gang specialist" for 18 years. His main function as a gang specialist was to monitor and obtain information about street gangs, including the Gangster Disciples. Since 1992, Richardson had been detailed to an investigation with federal authorities into the

---

[1]Submitted by the State as supplemental authority following oral argument.

Gangster Disciples. The trial court permitted Richardson to testify as an expert generally, as to the internal hierarchy and structure of the Gangster Disciples, specifically, as to matters of money and power within the gang, and to the specific fact that gang member Chuck Dorsey was " 'given the OK by Larry Hoover' " to take control of the city for the gang. *Clifton*, 342 Ill. App. 3d at 708.

On appeal, this court initially affirmed admission of Richardson's testimony as an expert, finding that there was " 'no showing that the average layperson has any understanding of the inner workings of gangs *** or of the jury's common knowledge of them.' " *Clifton*, 342 Ill. App. 3d at 708, quoting *Cruzado*, 299 Ill. App. 3d at 141. The court further found that Richardson's more detailed testimony explaining the organizational structure of the gang's leadership, including the identity of the gang members and their ranks and rivalries, was reliably based on variety of sources and specifically relevant to explain the murder and attempted murder of fellow gang members. *Clifton*, 342 Ill. App. 3d at 708-09.

Second, the *Clifton* court found that Richardson's testimony was relevant to the State's theory of the case as a gang-related motive. In *People v. Davenport*, 301 Ill. App. 3d 143, 150-51, 702 N.E.2d 335, 341-42 (1998), we held that "[r]elevant evidence is that which has any tendency to make the existence of a fact of consequence to the determination of the action more or less probable than it would be without the evidence." Relying on *Davenport*, the court in *Clifton* held that Richardson's testimony supported the theory that there existed a leadership vacuum within the gang after Hoover's conviction and Dorsey's murder. *Clifton*, 342 Ill. App. 3d at 711.

Finally, the court found that the probative value of Richardson's testimony outweighed its prejudicial effect as it provided " 'a motive for an otherwise inexplicable act.' " *Clifton*, 342 Ill. App. 3d at 711, quoting *Davenport*, 301 Ill. App. 3d at 151, 702 N.E.2d at 342. This court found that the killing of Holton and the shooting of Brown would be inexplicable without the gang-related evidence.

*People v. Mason*, 274 Ill. App. 3d 715, 653 N.E.2d 1371 (1995), is instructive. In *Mason*, the defendant and the victim were both Gangster Disciples. The State introduced gang specialist testimony to support its theory of motive, which was that defendant was ordered to kill the victim by a superior member of the gang, who was concerned that the victim would become an informer for the State. This court concluded that gang crime specialist testimony was irrelevant, inflammatory, and excessive. While the structure of the Gangster Disciples was relevant to the State's theory of motive, testimony regarding gang rivalries, tattoos and drug sales was not relevant. *Mason*, 274 Ill. App.

3d at 722, 653 N.E.2d at 1375-76. This court concluded that defendant was denied a fair trial.

Here, there is no evidence of a gang dispute, a gang "hit," or any gang rivalries. There is a distinction between a case where the victim and the defendant are rival gang members, and this case, where the victim is a police officer. Sergeant Moore was brought in by the State to make it appear as though defendant, as the State would have this court believe, was a high-ranking drug-dealer, seeking revenge against the police who foiled his attempt to engage in a large narcotics sale three days prior to the shooting. However, the evidence at trial revealed that no drug sale was observed, and although the record is silent as to whether defendant was admitted to bail, this court knows that defendant was released on bail, because a mere three days after his arrest he was "walking guard duty" at the Robert Taylor Homes. There is no argument made that defendant was a fugitive from the law at the time of his arrest for the shooting.

In *Davenport*, although we ultimately affirmed the defendant's conviction, we advised that the prosecutorial tactics employed " 'push[ed] the envelope.' " *Davenport*, 301 Ill. App. 3d at 152. Here, the State has signed, sealed and delivered a reversible letter.

## II

I further find that the admission of the prior inconsistent statements of the six recanting witnesses is reversible error. Serious doubt exists as to the voluntary nature of the original inculpatory statements of the recanting witnesses, who were held in police custody for up to 24 hours prior to being forced to testify before the grand jury.

• **Lacole Dismuke** testified at the grand jury that at the time of the shooting, she was at the east side of the building located at 4101 S. Federal and saw defendant fire a gun.

At trial, Lacole stated that she was held by police for 14 hours. Lacole denied being an eyewitness to the shooting and denied telling police anything about the shooting or about a Gangster Disciple drug operation at 4101 S. Federal. Lacole testified that she did not see the shooting because she was actually located on the west side of the building when the shooting occurred. Lacole stated that when she heard the gunshot, she ran to apartment 810 in 4037 S. Federal and watched emergency vehicles arrive from that apartment. Later that morning, Lacole returned to apartment 609 in 4101 S. Federal, where she stayed with her sister. There, Lacole's sister showed Lacole a gun, and Lacole handled the gun.

Lacole further testified that five police officers awoke her at 4 a.m. on August 17, 1998, by banging on her door, and transported her to

Area One police headquarters. Lacole stated that after coaching from the detectives, she met with Assistant State's Attorney Kelly and repeated the story that the police told her to tell. Lacole stated that her sister and Tameesha Bolden were also coached as to what to say at the grand jury.

• **Carlos Hendricks** testified at the grand jury that he saw defendant shoot a gun on August 15, 1998. At trial, Hendricks testified that he was in police custody for more than 24 hours. Hendricks testified that at 3:30 a.m. on August 15, 1998, he was in his sister's apartment at 4037 S. Federal, and that he did not see who shot Officer Ceriale. At one point during his detention, the door to the interrogation room was left open and an unidentified man walked past the door, pointed at Hendricks, and said: "That's him." Hendricks was taken directly to the grand jury after giving his statement.

• **Calvin Brown** was 17 years old at the time of the shooting. Brown testified that although he "voluntarily" turned himself in to police, he was held by police for more than 20 hours and questioned outside the presence of his mother, even though his mother was present at the police station. Brown further stated that he was left alone in the interview room, without food or blankets, and later placed in a cell until Detective Murray returned to his shift and continued to question Brown. Brown testified that the story he eventually agreed to tell police was flawed, stating that if he and the shooter had both been in the locations he described in the statement, Brown could not have seen fire coming out of the end of the gun, as asserted in the statement.

Brown's mother, Catherine Smith, testified that she had been at Area One with her son initially, then left and returned after work, to find that her son was still in custody after 20 hours. Smith testified that when she saw Brown, he looked scared and upset and told her that he was cold and hungry, and that police had hit him. While Smith was at Area One, a detective showed Brown a yellow tablet displaying a hand-drawn diagram of the area around 4101 S. Federal, showing the location of benches and where certain individuals were thought to have been standing at the time of the shooting. Brown told the officers that the drawing did not accurately depict the scene at the time of the shooting. However, after the detectives left the room, Brown told Smith that even though he had nothing to do with the shooting, he was going to adopt the story concocted by the police because he feared being charged as an accessory to the crime and doing time in jail. Brown signed the statement at 12:30 a.m.

• **Fannie Louise Howard** testified that she was held by police and kept awake for 24 hours prior to her grand jury testimony. Howard

stated that when the police arrived at her apartment on August 17, 1998, she was high on alcohol and marijuana. She stated that the police refused to question her at home, tore her from the arms of her crying children, and transported her to police headquarters, where police surrounded her and yelled at her, and Howard stated that Detective Edward Adams took a false statement from her at 3 a.m. Howard testified that the falsity of the statement is shown by the fact that although the statement says that Howard watched through her chained door as defendant approached apartment 609, in fact, when the chain is attached to the door of Howard's apartment, Howard cannot see the entrance to apartment 609, which is down the hall from Howard's apartment.

Howard testified that after she signed the statement, she was escorted back to her apartment by two female police officers and Detectives Rose and Adams. The officers watched Howard as she took her diabetes medication, did not leave her side while she was in her apartment, and returned her to Area One at 6 a.m. to wait for the grand jury. Howard stated she met with Assistant State's Attorney Kelly prior to testifying, but did not tell him that her testimony was false because she was terrified and had not slept in over 24 hours.

• **Treyvon Louis** testified that although he, too, turned himself in to police voluntarily, he was held for hours, and, as the majority notes, struck repeatedly by police, and not allowed to obtain insulin for his diabetes.

• **Tameesha Bolden**, who was only 14 years old at the time of the shooting, testified at trial that on August 17, 1998, the police kicked in the door to the apartment where she was staying, took her to police headquarters, then questioned her for two to three hours without either a parent, guardian or youth officer present. Bolden testified that Detective Rose told her that the police had already arrested defendant, and he gave her a statement to memorize, which she recited at the grand jury.

In rebuttal of the testimony of each of the six witnesses, the State presented the testimony of the police detectives, and prosecutors who "interviewed" the witnesses, each of whom denied any of the abuses testified to by the witnesses. The State presented no evidence, however, that any independent investigation of the witnesses' claims was undertaken to show that the statements were, in fact, voluntarily made. See, *e.g.*, *People v. Parker*, 234 Ill. App. 3d 273, 280, 600 N.E.2d 529 (1992) (evidence insufficient to sustain defendant's conviction where no evidence existed corroborating three recanted witness statements). There is no evidence rebutting the witnesses' claims of lengthy detentions.

Although the six witnesses were not placed under arrest *per se,* under the facts and circumstances of this case we can analogize their detention to the detention and custody of a suspect. This court recently reversed the conviction of a defendant after examining facts which showed that the defendant *voluntarily* agreed to accompany police detectives to the police station, was placed in an interview room, and was held for 73 hours prior to being charged. This court held the length of time in detention was unreasonably excessive:

> " 'The consequences of prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships.' " *People v. Willis,* 344 Ill. App. 3d 868, 877 (2003), quoting *Gerstein v. Pugh,* 420 U.S. 103, 114, 43 L. Ed. 2d 54, 65, 95 S. Ct. 854, 863 (1975).

*Gerstein* requires a prompt determination of probable cause within 48 hours of a warrantless arrest. If the delay is longer than 48 hours, the burden shifts to the State to show that the delay was due to a "bona fide emergency or other extraordinary circumstance." *County of Riverside v. McLaughlin,* 500 U.S. 44, 57, 114 L. Ed. 2d 49, 63, 111 S. Ct. 1661, 1670 (1991).

In this case, the six witnesses were not suspects. The detention of these mere witnesses for lengthy periods, some in excess of 24 hours, indicates the involuntary nature of their statements and constitutes unlawful detention in violation of the fourth amendment to the United States Constitution. See *Arizona v. Evans,* 514 U.S. 1, 10, 131 L. Ed. 2d 34, 44, 115 S. Ct. 1185, 1191 (1995).

Especially egregious is the complete lack of evidence in the record explaining how it came to pass that a 14-year-old girl was detained and questioned by police outside the presence of her parents or a youth officer to represent her interests, and that a 17-year-old boy was kept for questioning after his parents left the police station. Again, by way of analogy, I note the long line of authority regarding the taking of a juvenile's confession as " 'a sensitive concern.' " *In re G.O.,* 191 Ill. 2d 37, 54, 727 N.E.2d 1003, 1012 (2000), quoting *People v. Prude,* 66 Ill. 2d 470, 476, 363 N.E.2d 371, 373 (1977). In analyzing the voluntariness of a juvenile's confession, courts must take great care to assure that these statements were neither suggested or coerced nor a product of fright or despair. *People v. Kolakowski,* 319 Ill. App. 3d 200, 213, 745 N.E.2d 62, 74 (2001). Courts look to the totality of the circumstances and consider factors including defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or

mental abuse by police, including any threats or promises. *In re G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012. Additional factors to consider when assessing the confession of a juvenile include the time of day when questioning occurred and the presence or absence of a parent or other adult interested in the minor's welfare. *People v. Plummer*, 306 Ill. App. 3d 574, 584, 714 N.E.2d 63, 70-71 (1999). No single factor is dispositive. *In re G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012. Because a minor is " 'an easy victim of the law,' " his confession will be found involuntary if the facts reveal that it was " 'a confession wrung from a child by means which the law should not sanction.' " *In re V.L.T.*, 292 Ill. App. 3d 728, 736, 686 N.E.2d 49, 54 (1997), quoting *Haley v. Ohio*, 332 U.S. 596, 599, 601, 92 L. Ed. 224, 228, 229, 68 S. Ct. 302, 303, 304 (1948).

Our supreme court has found that the "concerned adult" factor, whether the juvenile had an opportunity to speak with a parent or adult interested in his welfare before or during interrogation, is an important element in determining the voluntariness of defendant's confession. *In re G.O.*, 191 Ill. 2d at 55, 727 N.E.2d at 1012. While there is no *per se* rule that juveniles must be allowed to consult with their parents prior to questioning, courts have repeatedly held that police conduct which frustrates parents' attempts to confer with their child is particularly relevant and a significant factor in the totality of the circumstances analysis. *In re G.O.*, 191 Ill. 2d at 55, 727 N.E.2d at 1013; *People v. McDaniel*, 326 Ill. App. 3d 771, 762 N.E.2d 1086 (2001); *People v. Golden*, 323 Ill. App. 3d 892, 900, 753 N.E.2d 475, 482 (2001); *Kolakowski*, 319 Ill. App. 3d at 214, 745 N.E.2d at 75; *In re J.J.C.*, 294 Ill. App. 3d 227, 235, 689 N.E.2d 1172, 1179 (1998); *In re Lashun H.*, 284 Ill. App. 3d 545, 553, 672 N.E.2d 331, 336 (1996). "It suggests that, at worst, the police were trying to coerce a confession and at best that they were conducting the interrogation without due regard for the suspect's age." *In re R.T.*, 313 Ill. App. 3d 422, 430, 729 N.E.2d 889, 895 (2000), citing *In re V.L.T.*, 292 Ill. App. 3d at 737, 686 N.E.2d at 55; *In re Lashun H.*, 284 Ill. App. 3d at 554-55, 672 N.E.2d at 337; *People v. R.B.*, 232 Ill. App. 3d 583, 595, 597 N.E.2d 879, 887 (1992).

Recently, in *People v. Griffin*, 327 Ill. App. 3d 538, 763 N.E.2d 880 (2002), this court reversed and remanded the conviction of a 15-year-old juvenile defendant, after determining that no adult was present to act in the juvenile's interest during his 18-hour detention at the police station as a suspect for a murder. The defendant was prevented from seeing his parents, and although a youth officer was present at the time of defendant's interrogation, he participated in the investigation, actively gathering evidence against the defendant rather than representing the defendant's interests. This court held that the

coercive atmosphere surrounding the defendant's confession dictated that his confession was involuntary. *Griffin,* 327 Ill. App. 3d at 547-49.

A similarly coercive atmosphere exists in the present case surrounding the inculpatory statements made by all six witnesses against defendant. As detailed above, these witnesses were detained for lengthy periods of time and underwent serious constitutional deprivations. As such, the trial court erred in admitting the prior inconsistent statements of these witnesses obtained as a result of the illegal detention.

## III

Added to the lack of clarity surrounding the voluntary nature of the eye-witness testimony is the admission of the hearsay testimony of Officers Ferenzi and Jones as to conversations they each had with the deceased regarding the identification of defendant. According to the majority, Officer Ferenzi was allowed to testify that although he did not see who shot Officer Ceriale, he was able to identify defendant because Officer Ceriale described defendant as the shooter to Officer Ferenzi prior to his death. Officer Ferenzi testified that after being shot in the leg, Officer Ceriale stated "he shot me," and that Officer Ferenzi *knew* that the *"he"* Officer Ceriale referred to was the "male in orange." It is not known by the facts as detailed by the majority whether this evidence was admitted under the dying declaration exception to the rule against hearsay or whether there was any defense objection to the admission of this testimony.

We do know from the facts, however, that the above testimony could not have been properly admitted under the dying declaration exception because Officer Ceriale's death was not imminent. Dying declarations are admissible into evidence only if it appears that such declarations are "made by the victim under the fixed belief and moral conviction that death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance," when the victim "has despaired of life and looks to death as inevitable and at hand." *People v. Odum,* 27 Ill. 2d 237, 242-43, 188 N.E.2d 720 (1963); See also *People v. Georgakapoulos,* 303 Ill. App. 3d 1001, 1008, 708 N.E.2d 1196 (1999) (dying declaration admissible as an exception to the hearsay rule " 'in the assumption that belief of impending death excludes the possibility of fabrication by the declarant,' " quoting M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 804.6, at 778 (6th ed. 1994)).

The requirements for admitting a dying declaration into evidence are: (1) the declaration pertains to the cause or circumstance of the homicide; (2) the declarant must believe that death is imminent; and (3) the declarant must possess mental faculties sufficient to give an

accurate statement about the circumstances of the homicide. *People v. Lawson*, 232 Ill. App. 3d 284, 292, 596 N.E.2d 1235 (1992). These factors must be proven beyond a reasonable doubt, based on the totality of the facts and circumstances surrounding the declaration. It is the state of mind of the deceased and not that of any other person which guarantees the truthfulness and determines admissibility. *Odum*, 27 Ill. 2d at 243-44.

Here, the record shows that Officer Ceriale was shot on August 15, 1998, and did not die until six days later, on August 21, 1998. In fact, Detective James Jones testified that he spoke with Officer Ceriale "after the shooting," later than the time Officer Ceriale allegedly identified defendant to Officer Ferenzi. Detective Jones stated that Officer Ceriale told him details of their surveillance operation, that he and Officer Ferenzi were "watching the dope selling" in front of 4101, and gave Jones a detailed description of the shooter and his clothing. Officer Ceriale complained that he was "shot in the leg," but the record does not reveal the officer's state of mind as fatally injured. It was not until later that the facts show Officer Ceriale stating that he was "not going to make it." The elements of these statements as dying declarations were not established beyond a reasonable doubt. If no objection was made at trial, these statements are nonetheless reviewable as plain error and highly prejudicial to defendant.

## IV

I also find that the evidence of gang intimidation was improper where no evidence of intimidation was tied to defendant at trial.

Prosecutors are forbidden from arguing or presenting testimony that a witness is afraid of a defendant, afraid to testify, or otherwise afraid due to involvement in a case unless the prosecution first directly connects such fears to defendant's conduct. *People v. Mullen*, 141 Ill. 2d 394, 405-07, 566 N.E.2d 222, 228-29 (1990). Evidence of a defendant's intimidation of a witness is admissible only if there is actual evidence that the defendant made such threats. *People v. Terry*, 312 Ill. App. 3d 984, 996-97, 728 N.E.2d 669, 679-80 (2000).

Defendant argued that there was no evidence to suggest that the incident that occurred on August 19, 1998, where a group of people confronted Lacole Dismuke at her apartment, was connected to defendant. Defendant cites the grand jury and trial testimony of Lacole wherein she stated that the confrontation was solely between her and the sisters of codefendant Brandt and other neighbors, mostly numbering in women and young children.

A witness may be impeached by showing interest, bias or an inclination to testify falsely. *People v. Williams*, 262 Ill. App. 3d 734,

743 (1994). Testimony that a prosecution witness fears for his safety and the safety of his family as a result of cooperation with the prosecution is admissible to show reasons for inconsistent statements. *People v. Rainge*, 211 Ill. App. 3d 432 (1991).

At trial, Lacole testified that she was placed in witness protection and that time and money was spent moving her to different locations to protect her. However, there was no evidence of the intimidation of Lacole by defendant or any alleged Gangster Disciples. This particular evidence was neither relevant nor credible to prove that Lacole was intimidated by defendant to change her testimony, and the State's use of this evidence sounds in unlawful "guilt by association." There is no basis for a reasonable inference that Lacole was the victim of gang intimidation based on the evidence at trial. As such, the evidence was improperly admitted.

## V

The majority concludes that no reversible error is found in the closing and rebuttal arguments of the prosecutor. I disagree.

Defendant objected to the prosecutor's following remark:

"Did your memory get a little better when Ms. Brown, Jonathan's attorney, *the Gangster Disciples' attorney* was asking you ***?" (Emphasis added.)

Despite the fact that defense counsel's objection to this comment was sustained by the trial court, this error is as easily cured as the unringing of a bell. This comment by the prosecutor, implying that the public defender represented the entire Gangster Disciples' gang, was highly improper and in and of itself constitutes reversible error.

In *People v. Blue*, 189 Ill. 2d 99 (2000), our supreme court recognized that a pervasive pattern of error, engendered in the main by prosecutorial misconduct, had divested defendant of his right to a fair, orderly, and impartial trial, a substantial right that inures to a criminal defendant whether guilty or innocent. The *Blue* court reversed that defendant's conviction, finding that the trial was permeated by the presentation of emotionally charged evidence and that the prosecutors had encouraged the jury to "return a verdict grounded in emotion, and not a rational deliberation of the facts." *Blue*, 189 Ill. 2d at 139. Subsequently, and applying the principles established in *Blue*, our supreme court reversed the judgment against defendants in the consolidated cases of *People v. Johnson*, 208 Ill. 2d 53 (2003) (hereafter, the consolidated cases), citing improper conduct on the part of the State's Attorneys prosecuting those cases.

The majority glazes over the conclusions of our supreme court in these cases, finding that the "prosecutorial misconduct here was not

so repeated or egregious," as in those cases. 347 Ill. App. 3d at 224. Again, I demur. The prosecution here demonstrated a similar level of abhorrent conduct.

This court may invoke the plain error rule to review alleged errors not properly preserved when: (1) the evidence in a criminal case is closely balanced; or (2) the error is so fundamental and of such magnitude that the accused is denied the right to a fair trial and remedying the error is necessary to preserve the integrity of the judicial process. *People v. Lindsey*, 201 Ill. 2d 45, 54 (2002). Absent reversible error, there can be no plain error. *People v. Williams*, 193 Ill. 2d 306, 349 (2000). A "pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain error doctrine." *Johnson*, 208 Ill. 2d at 64.

The prosecution here concocted a "Great Drug Sale-Murder-Conspiracy Case" out of thin air, culminating in the casting of aspersions upon defense counsel as the *representative* of an organized street gang. In doing so, it is clear that the prosecutor intended that the jury believe that the shooting of an unseen officer, hidden in the shrubbery at 3 a.m., by a 16-year-old boy, was a well-orchestrated gangland shooting. The comment by the prosecutors here is even more egregious than the term "paid advocate," a comment deemed improper by this court in *People v. Hawkins*, 284 Ill. App. 3d 1011 (1996). As I have stated, there is nothing in this record that the shooting of Officer Ceriale was gang motivated. This comment by the prosecutor was made in furtherance of the improper theory of the case, designed to appeal to the jurors' passions and emotions, and therefore highly prejudicial to defendant. It is plain error and as such constitutes reversible error.

Likewise, I take exception to the majority's conclusion of propriety regarding the prosecutor's comment about defendant's stock "skyrocketing," and his supposedly earning a "badge of honor" because he shot a police officer. There is not a modicum of evidence in the record revealing that defendant had any idea that a police officer was hidden in the shrubbery at 3 a.m.—the evidence clearly discloses that Officers Ceriale and Ferenzi were dressed in *plain clothes*. This argument, supposedly based on the testimony of Sergeant Moore, which I have already explained as improper, was highly prejudicial to defendant.

As in the consolidated cases, the cumulative effect of the prosecutorial errors here created a pervasive pattern of unfair prejudice to defendant's case. See *Johnson*, 208 Ill. 2d at 62.

## VI

Finally, defendant's sentence as an adult on his conviction for possession of a controlled substance with intent to deliver is improper. Defendant was merely 16 years old at the time of the offense. Section 5—130(1)(a), which permits a juvenile to be prosecuted and sentenced as an adult for "that offense and *any other charges arising out of the same incident*," does not apply here. (Emphasis added.) 705 ILCS 405/5—130(1)(a) (West 2000). The majority does not communicate whether this conviction for possession was defendant's first offense, or any other pertinent details regarding defendant's criminal background, or lack thereof. Detailed facts of defendant's purported possession of drugs have not been set forth to support the majority's assumption of defendant as a high-ranking, 16-year-old juvenile walking so-called "guard duty," at 3 a.m., and to support the "expert" testimony of Sergeant Moore. Defendant was sentenced excessively as though he were a "Drug Lord Dealer-Ringleader," when the facts more accurately show that defendant had in his possession a small amount of a controlled substance, 7.6 grams, that he intended to sell for someone else. I note that under the Illinois Controlled Substances Act, penalties for possession of a controlled substance begin at a minimum of four years for the possession of *15 grams*. 720 ILCS 570/402 *et seq.* (West 1998). A resentencing hearing on defendant's drug conviction is indicated.

Accordingly, I dissent.